(Decided March 11th, 1859.)

# STATE OF MARYLAND *vs.* THE BALTIMORE & SUS-QUEHANNA STEAM COMPANY.

The act of 1838, ch. 375, "to prevent the transportation of people of color
upon railroads or in steamboats," enacts, "that it shall not be *lawful* for
any *slave* to be transported on any railroad, or any steamboat, &c., *with-
out a permission in writing from the owner of such slave,* under the penalty
of $500 for every violation of this act, to be recovered by an action of
debt, in the name of the State, from such railroad companies, or the
*owners* or captains of such steamboats," &c. HELD:

That the owners of a steamboat cannot escape from this penalty by showing that neither they, nor their agents, had any knowledge the slave was on board the boat, and had no intention to violate the law, and had used reasonable diligence to prevent such persons from coming aboard.

This act was passed to *remedy the evil* of the great loss suffered by slave-owners, by the facilities of escape afforded to slaves, by means of railroads and steamboats, and the Legislature having used words, which, by their *plain meaning*, are *adequate to the end proposed,* the law must be interpreted by its letter.

Where one of two innocent parties must suffer, the loss ought to fall on him who could most easily have prevented it.

A steamboat was chartered by certain parties, to carry passengers on an excursion to a certain place and back, and the charterers had exclusive control over, and the pay for, the passengers, with the power to regulate the terms of passage, and what passengers should, and should not, go on the boat, but the steamer was *navigated* by the captain and crew of her owners.  HELD:

That the latter, and not the charterers, were to be regarded as *owners* of the boat for the trip, and chargeable and responsible as such.

A charterer who, by his contract, hires, and has exclusive possession, command and navigation of the ship for the voyage, is the *owner* for the voyage, but if the general owner retains such possession, command and navigation, or contracts to carry a cargo on freight for the voyage, he is the *owner* and responsible as such.

Where the freighter is owner for the voyage, he is responsible for the conduct of the master and crew, during the voyage; where he is not such owner, the liability attaches to the general owner.

APPEAL from the Court of Common Pleas.

*Debt,* brought on the 13th of September 1855, by the State against the appellee, to recover the penalty imposed by the first section of the act of 1838, ch. 375, for the illegal transportation of a slave.   Plea, *nil debet.*

*Exception.* It was agreed, that the defendants were, in August 1855, the owners of the steamer Lancaster mentioned in the declaration, and have been, since that time, up to the bringing of this suit, except so far as that ownership is modified by a charter-party to be given in evidence.   The plaintiff then proved by a competent witness, that Henry Miles, a citizen of Somerset county, Maryland, was, in August 1855, the owner of a negro boy, "*Sam,*" and that at a camp-meeting which took place in that county, on the Annamessix river, the steamer Lancaster was there for bringing passengers to the

camp-meeting from Baltimore, and carrying them in return; that, on Sunday, witness went on board the said steamer to go to Baltimore, where the boat arrived the next morning, and that after the steamer left the camp-meeting, witness saw said negro "*Sam*" on board the boat, in the public passage from bow to stern, talked with him, and has not seen him since that time.

The defendants then proved, that before the camp-meeting above mentioned, the Lancaster was chartered by her owners to Charles Marshall, John T. Adams and Francis Mitchell, to carry passengers from Baltimore to the camp-meeting and back to Baltimore; that the captain and crew of the owners were to navigate the steamer, and the charterers were to have the exclusive control and pay for the passengers, going and coming, and regulate the terms of passage; and that under this contract of charter, the charterers had the right to determine what passengers should or should not go in said vessel, and exercised that control during the continuance of the contract, and were to pay a compensation to the owner of $112.50; that the steamer left Baltimore on Saturday night before the camp-meeting, reached the Annamessix river on Sunday morning about 9 o'clock, remained there until Sunday evening at 6 o'clock, and reached Baltimore next morning; that whilst in the river, at the camp-meeting, Marshall, one of the charterers, sold some tickets for the trip back, but only one to a negro man, he having gone down without a ticket; that about one hour before the boat left, they ordered all negroes and other persons, on board, to leave, and after the decks were cleared, the charterers took their stations at the three gangways, (the fourth being shut up;) that one black woman, a slave, was on board, who did not go down, and there were from fifteen to twenty negroes on board, and that Mitchell knew the negro "*Sam*," but Adams and Marshall did not; that the charterers remained at the gangways to receive tickets, until the boat left, and after she left Mitchell went into every hole and corner of the boat, except the fireman's room, to collect tickets and to see if improper person or persons without tickets, were on board; that he knew "*Sam*," and upon

making such search did not see him at that time or after. They further proved, that no negro was in the fireman's room at any time during the trip to Baltimore, and that the captain of the Lancaster made a search after the boat had left the camp-ground, on her return to Baltimore, and looked in all parts of the boat to see if slaves were on board, and that he found no negro on board, except such as went down in the boat.

The plaintiff then asked an instruction to the jury, that if they believe, from the evidence, that the negro "*Sam*," spoken of by the witnesses, was the slave of Henry Miles, and was, in August 1855, transported from Somerset county to Baltimore, on board the steamboat Lancaster, without the permission in writing of said Miles, and did so escape from his said master, and that the defendant was then the owner of said steamboat, then the plaintiff is entitled to recover.

This prayer the court (MARSHALL, J.) refused to grant, as well also as several asked by the defendants, but gave the jury the following instruction:

"If the jury believe from the evidence in the cause, that the steamboat spoken of in the pleadings and evidence was, at the time referred to in the same, the property of the defendant, and that she made the trip from Baltimore to the Eastern Shore of Maryland and back, as stated in the evidence, under the command and management of officers and men in the employment, and under the control, of said defendant; and if they shall find, that the colored man spoken of in the pleadings and evidence, was, at the time of said trip, a slave, and the property of a citizen of this State, and that being such slave he was transported, on the occasion of the trip referred to, on board said boat, from the Eastern Shore of Maryland to Baltimore, or any other place, without a written permission from his master, then they will find a verdict for the plaintiff, unless they shall find, that at the time of said trip, the said boat was officered and manned with competent men to prevent the transportation of slaves on board of said boat, and that on the occasion of said trip, the officers and others, having the control and management of said boat, used all proper precau-

tion to guard against the transportation of any slaves, and that such transportation took place, if at all, notwithstanding all reasonable and due diligence, on the part of said officers and other persons, to prevent the same."

To the refusal of its prayer, and to the granting of the instruction given by the court, the plaintiff excepted, and the verdict and judgment being in favor of the defendants, appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*William S. Waters* and *J. Nevitt Steele* for the appellant.

The proper construction of the first section of the act of 1838, ch. 375, is the question presented in this case, and it is submitted, that by the true construction of this law, no question of diligence or proper caution should have been submitted to the jury, and that the only facts necessary to a recovery were those set out in the appellant's prayer, because:—

1st. This is the clear and plain meaning of the words of the act. The thing declared *unlawful* is, "for any slave to be transported without the written permission of his master, mistress or owner." It refers to no active agency by any one, and as a consequence of "every violation of this act" the penalty is given.

2nd. The ordinary meaning of a statute is to prevail, if such meaning is clear and free from doubt. The court cannot look outside of a statute in order to find its intent, when that intent is plainly expressed. *2 Paine's C. C. Rep.*, 584, *Coleman vs. Strong*.

3rd. The object of the statute was to meet an extraordinary emergency described in its preamble, and no other construction can make it available to that end, except that contended for by the appellant. If such is not the construction, the statute is ineffective, for nothing would be added to the security given by the common law in such cases. *6 G. & J.*, 297, *Steam Nav. Co. vs. Hungerford.* *15 Mees. & Wels.*, 404, *Regina vs. Woodrow*.

24      v. 13.

Nor is there any force in the position assumed by the appel-·
lees, that they were not the *owners* of the boat at the time,·
and therefore not the parties liable. Within the purview of
this act, a *charterer* cannot be considered as the *owner*. But
apart from this consideration, Adams, Marshall and Mitchell
were not *owners* within the meaning of that term as used·
in commercial law. They chartered the boat for this particu-
lar trip, but she was navigated by the *captain* and *crew* of
the defendants, and this constitutes them owners, no matter
who may have chartered the boat for the particular trip.·
3 *Kent*, 135. *Abbott on Shipping*, 67 to 69.

*Cornelius· McLean* for the appellees.

This case arises under the first section of the act of 1838,·
ch. 375, which prohibits, under the *penalty* of $500, the trans-
portation of slaves on railroads or in steamboats, and the suit
is for that *penalty;* and it is insisted· on the part of the appel-·
lees:—

1st. That the instruction granted by the court puts the true
construction upon this act. It is a penal statute, and there-
fore to be strictly construed; and if it appears, as this instruction
assumes, that the defendants acted in good faith, diligently
and with proper precaution, with the proper means in their
possession, they are not guilty in the eye of the law. *Dwar-
ris on Statutes*, 662. 5 *Esp*., 203, *Wright vs. Smith*.
There was no secreting or intention,·on the part of the defend-
ants, to bring away the slave.

2nd. It appears from the testimony, that the steamer be-
longing to the appellees, on which it was alleged the slave
was transported, was, in fact, *chartered* for the voyage to other
parties, who, by the terms of the contract, were to have ex-·
clusive control over the passengers, to say who should and
who should not go on the boat, and· that they *exercised* this
control. These charterers were the parties responsible, and
the defendants cannot be made answerable criminally for the·
conduct of others. These defendants were not the owners of
the boat at the time, for they had, in fact, parted with the
control of the steamer, and therefore could not be held respon-

State *vs.* Balto. & Susq. Steam Company.

sible under this law.  *Ware's Rep.*, 149, 153, *Drinkwater vs. The Spartan.  Conkling's Admiralty*, 175.

TUCK, J., delivered the opinion of this court.

This is an action of debt to recover the penalty imposed by the first section of the act of 1838, ch. 375, "To prevent the transportation of people of color upon railroads or in steamboats." The questions for consideration relate to the construction of the act of Assembly, and to the ownership of the steamboat at the time the negro in question escaped.

At the trial below the State offered a prayer affirming its right to recover, on the facts given in evidence; and the defendant offered four, but the court rejected all the prayers, and gave an instruction to the jury, to which, as well as to the refusal of its own prayer, the State excepted.

As to the position on the part of the appellee, that the company, or its agents, had no knowledge that the negro was on board, and had no intention to violate the law, we think that the liability may be enforced without reference to such circumstances. The act must be interpreted by the language employed, which cannot be construed so as to aid that defence, without ascribing to the Legislature an intention not apparent from the letter. The transportation of slaves, without written permission, was the act against which this legislation was directed. The reasons for passing the law are set out in the preamble. If the Legislature deemed it expedient, in view of the grievance complained of, to hold persons responsible for transporting negroes, whether they were instigated by a criminal intent or not, they had the power to do so. Such acts may produce mischief in individual cases, but the inconvenience and injury would be much more general if, in every case of this kind, the party charged could defend himself by offering evidence that he did not know the negro was on board of the boat, and that reasonable diligence had been used to prevent such persons from coming on board. The law would scarcely afford any protection to slave-owners. There is no hardship in this view of the case, if we consider the condition of the parties. A master cannot always keep his servants at

home, he allows them reasonable indulgence in this respect, but the captain of a boat or the conductor of a railroad car can keep them out of the boats and cars. If one or the other must suffer, ought not the loss to fall on him who could most conveniently have prevented it? 4 *Metcalf*, 49. *Pettigrew vs. Barnum*, 11 *Md. Rep.*, 447.

A negro is presumed to be a slave, and if persons in charge of these conveyances will prevent them from entering, unless they show themselves to be free, or have written permissions, the risk would be avoided.

We suppose, that if the Legislature had designed that the liability should depend on the want of care and diligence on the part of the owners of the boat, proper words would have been employed. It is true, that statutes are not always to be interpreted by their letter. Sometimes cases not within the words are held to be within the act; and other cases are, by construction, taken without the operation of the law, though covered by the language, according to the intent and design of the Legislature, to be collected from the whole act, with reference, also, to the mischief, or cause of making the law. *Scaggs vs. Rail Road Co.*, 10 *Md. Rep.*, 268. The Legislature intended "to prevent the transportation of people of color upon railroads or in steamboats," as shown by the title of the act, because, as recited in the preamble, it had been represented to the Assembly, that the owners of slaves had suffered great loss by the facilities of escape afforded to slaves, by means of railroads and steamboats; and "for remedy of said evil," the act was passed. Now, if the Legislature used words, which, by their plain meaning, are adequate to the end proposed, would it not be going in the face of the law, to give them a different construction, by allowing the party charged to excuse himself, in the manner proposed in this case, when the law, in terms, declares, that the transportation of slaves, without permission in writing, shall be unlawful under the penalty sought to be recovered here? The case of *Wright vs. Smith*, 5 *Esp.*, 202, bears no analogy to the present, because the very gist of the action was the fraudulent holding over of the tenant, under the *Stat.* 4 *Geo., II, ch.* 28, for "prevent-

ing of frauds committed by tenants," and the court held, that the penalty could not be recovered where there was no fraud on the part of the tenant. The very defence relied upon was implied in the terms of the statute. Nor is this act to be construed as that of the same session, ch. 244, "to repair injuries by railroad-carriages and engines," because such companies, by the terms of the law, are not made responsible if they can prove, to the satisfaction of the tribunal before which the case may be tried, that the injury complained of was committed without negligence on the part of the company or its agents.

We think, therefore, that the instruction given by the court was erroneous in so far as the right to recover was made to depend on the want of proper precautions to guard against transportation of slaves. Upon the other facts stated in the instruction, if found by the jury, the verdict should have been for the State, and this involves the question of ownership at the time.

According to the principles of mercantile law, the charterer of a vessel may become owner for the voyage, and this doctrine is sought to be applied to the present case. But we think we need not decide whether such an owner would be responsible under this act of Assembly, because, even according to the mercantile law, Marshall, Adams and Mitchell were not the owners. Although these persons had "exclusive control over, and the pay for, the passengers, and power to regulate the terms of passage, and what passengers should and should not go on the steamer, and did exercise such control during the contract," yet the steamer was navigated by the captain and crew of the defendant, and this circumstance has generally been held as determining the ownership to be in the general owner. Of course, the determination of this question must depend on the terms of the contract, or its purpose and object, for sometimes the nature of the employment will give the ownership to the charterer, as necessary to enable him to perform the service. *Smith's Merc. Law*, 375, *(Am. Ed.,* 1858.) We take the principle established by the Supreme Court, in the case of *Marcardier vs. The Chesapeake Ins. Co.*, 8 *Cranch*, 39, to be well established on authority: "A

person may be owner for the voyage, who, by contract with the general owner, hires the ship for the voyage, and has ex-clusive possession, command and navigation of the ship.  But where the general owner retains the possession, command and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter-party is considered as a mere af-freightment, sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership." See also *Hooe vs. Groverman,* 1 *Cranch,* 214, *and notes* in 1 *Peter's Cond. Rep.,* 301.   3 *Kent Com.,* 137.   This was not a contract to carry freight, but to carry passengers, which, we think, makes no difference in determining who was the owner on that occasion.   Where the freighter is owner for the voyage he is responsible for the conduct of the master and crew during the voyage; where he is not such owner that lia-bility attaches to the general owner.   Applying these rules, we presume there can be no doubt on the question, for the defendant, having retained the management of the boat by its own captain and crew, remained, and is chargeable, as owner of the boat.   The defendant was, therefore, not enti-tled to have its first prayer granted, even conceding, which we do not decide, that under any state of proof, the penalty may be enforced against one who is merely owner for the particular voyage or trip.

We are of opinion that the plaintiff's exception was well taken, as well to the court's refusal of its prayer as to the in-struction given.

*Judgment reversed and procedendo.*

(Decided March 11th, 1859.)