MARYLAND RACING COMMISSION *v.* McGEE ET UX.

[No. 76, October Term, 1956.]

*Decided January 16, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Norman P. Ramsey, Deputy Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for the appellant.

*Hilary W. Gans* for the appellees.

HAMMOND, J., delivered the opinion of the Court.

The Maryland Racing Commission appeals from an order

of *mandamus* requiring it to restore the license it had taken from a trainer of race horses after a finding that a drug had been administered to a winning horse trained by him.

In the exercise of its statutory duties, the Commission had duly promulgated Rule 111, providing that: "No person shall administer, or cause or knowingly permit to be administered, or connive at the administration of, any drug to any horse entered for a race. Every owner, trainer, or groom must guard, or cause to be guarded, each horse owned, trained or attended by him in such manner as to prevent any person or persons from administering to the horse, by any method, any drug prior to the time of the start of the race which is of such character as to affect the racing condition of the horse."

James McGee, the appellee, had been a trainer licensed by Maryland since the nineteen hundreds, and held a 1956 license. On March 16, 1956, a horse named "Morning After", trained by McGee, won the sixth race at Bowie. As was the practice, saliva and urine samples from the horse were taken after the race by the Commission's representatives and forwarded for chemical analysis. The saliva test was negative but the urine test showed the presence of a drug in the nature of caffeine, which the Commission's chemist said was a generic term that could embrace amphetamine, benzedrine, cocaine, and morphine. McGee was charged with violation of Rule 111 and the Commission held a hearing, at which an Assistant Attorney General presented evidence for the prosecution. McGee testified and, by counsel, cross-examined prosecuting witnesses and offered witnesses in his own behalf.

The Commission found (1) that the drug had been administered to Morning After prior to the sixth race at Bowie on March 16, 1956; (2) that the drug administered is a stimulant affecting the racing condition of a horse; (3) that McGee was responsible for the guarding of the horse so as to prevent the administering of such drugs; (4) that McGee did not meet this responsibility properly, and on the basis of these findings, found McGee guilty of violation of Rule 111 and suspended his license for a period of six months from April 1, 1956.

The record before the Commission shows that the proce-

dures for the taking of the saliva and urine to be tested are designed to insure that the samples be sealed in containers when taken and reach the chemist with the seals intact, identified only by numbers. It is not suggested that the procedure was not followed faithfully in this case and there is no real attack on the validity of the finding of the chemist, who testified that the drug was revealed by the spectrophotometer, an instrument that measures the amount of light passing through a sample. Different variations from normal amounts of light give indications of the presence of various drugs. The particular variation here indicated a caffeine type of drug. Tests made on crystals remaining after evaporation by the application of mercuric chloride, gold chloride and black gold confirmed the spectrophotometer. Photographs were taken of the crystals characteristic of the drug and offered at the hearing. A third test, a color test by the application of malic acid confirmed the first two. The chemist said there was definitely present a drug of the caffeine family. Asked in what quantity, he replied that his test could pick up three to four micrograms, that is, millionths of a gram of caffeine with accuracy, but that in this sample there was "so much there * * *—it was very easy."

The veterinarian for the Commission, asked as to the effect of the drug on horses, testified that caffeine type drugs "are recognized as general stimulants, systemic stimulants on the heart. They would have a tendency to * * * lower the fatigue of muscles, mask the fatigue of muscle fibres" and that this quite possibly would increase the horse's ability to run. It is often administered hypodermically, either intravenously, subcutaneously, or intramuscularly. He said also: "It would be practically impossible to differentiate between a horse in normal excitement and a horse that received a normal dose of caffeine. * * * This drug is rather variable in its action on horses." Only a small percentage of caffeine administered is eliminated through the urine and none, for all practical purposes, through the saliva. It is difficult, if not often impossible, to tell from the appearance or actions of the horse in the paddock whether he has or has not been given a drug.

McGee offered evidence to show that he had twenty horses

in his care who were stabled at Laurel and vanned to Bowie, when they were to race. Seventeen of the horses were in one barn, two in another, and the twentieth in a third. McGee employed a seventy-nine year old night watchman who came on duty at six o'clock in the evening and left at five in the morning, and a foreman who relieved the night watchman in the morning and was relieved by him at night. One of the duties of the night watchman was to feed the horses at three-thirty in the morning. After he had fed the seventeen in one barn, he went over to the other barns to feed the horses there stabled. McGee and each member of his staff, that is, the night watchman, the foreman and the groom, testified that they had not administered any drug to the horse. The horse's owner and the groom testified that before the race the horse showed no symptoms of stimulation, in their opinion, but was quiet. He did not need a lead pony. McGee testified that the horse was as he always was. He gave the jockey orders to hit Morning After twice at the starting gate to wake him, describing him as a "lazy horse". McGee says that the only way the horse could have been drugged was for someone to have taken advantage of the opportunity afforded by the absence of lights at the stable to administer the drug. He added that the watchman could not have been expected to stand at the door of the horses' stable in 25° weather. He intimated that the individual who might have done it was a former employee. Before the race, McGee said, he was suspicious that there might be trouble for two reasons. One was that Morning After's halter was not on him the morning of the day before the race. It had disappeared during the night and they had never found it or what happened to it. The second was that some time before he had caused the man he suspected, who was then working for him as watchman, to be barred from the race track and had refused him a day's pay the man claimed was due him. The former employee had gotten very angry and had threatened to make trouble for McGee and to get his money one way or the other. Several days before the race that Morning After won, McGee discovered that the former employee was working on the other side of the barn in which Morning After was stabled

and this made him uneasy and suspicious, particularly when the halter disappeared.

The groom testified that a great deal of coffee was being drunk in the receiving barn when Morning After was brought in before the race. The horse's owner described it as "a convention of coffee drinkers" and then suggested that the horse might have gotten caffeine in his system by reason of eating straw in the receiving barn on which coffee or coca-cola may have been spilled, or he may have gotten it after the race from coffee or coca-cola being spilled in the drinking water. He described either possibility as an outside one, "a thousand to one shot".

The testimony showed further that Morning After was the favorite in the race and that he won it by a length and a half.

The trial court heard the case on the record before the Commission and, of course, did not see the witnesses. He concluded that there was no evidence in the record to support the Commission's finding that McGee failed in his duty to guard the horse and, therefore, issued the writ of *mandamus* requiring the Commission to restore the license.

The Commission argues here that Rule 111 is a valid rule and that there was evidence to support its finding that McGee failed in his duty to guard the horse against the administration of a drug that would affect his racing condition. The appellees' counter to this is that the trial court was correct in finding no evidence to support the Commission's finding that McGee failed to meet the requirements of guarding the horse, that there was no evidence in the record sufficient to show that a drug in the nature of caffeine was administered before the race or to show that there had been given a sufficient amount to affect the racing condition of the horse. Finally, the appellees say that Rule 111 makes the trainer the insurer of the fact that the horse has not been given drugs before a race, because if drugs have been given, it follows that the trainer either gave them himself or was derelict in his duty under the Rule in preventing someone else from giving them, and that so construed, the Rule is unconstitutional and void under the holding of this Court in *Mahoney v. Byers,* 187 Md. 81.

In the *Byers* case, the rule prohibited the administration knowingly or carelessly of a drug to any horse within forty-eight hours prior to the time of the race in which he was entered, and further provided that if the chemical analysis or other competent evidence showed that a drug had been administered, the trainer should be subject to the prescribed penalty "* * * whether or not he administered the drug, or knowingly or carelessly permitted it to be administered." The presence of the drug shown by the analysis was made "conclusive evidence" either of knowledge on the part of the trainer or of his carelessness in permitting the drug to be administered. It was argued strongly to the Court in the *Byers* case that although the rule was set up in the form of a conclusive presumption, it actually made the trainer an insurer as a matter of substantive law, so that if the evidence showed the fact of stimulation and that the individual charged was the trainer, the trainer was responsible. The Court, in deciding the case, held, however, that an irrebuttable presumption was substituted for proof of the fact that the trainer administered the drug or was careless in allowing it to be administered and that the substitution of an irrebuttable presumption for the facts was arbitrary and unconstitutional. The opinion went on to say: "This irrebuttable presumption destroyed the right of appellee to offer evidence to establish his innocence."

It has been suggested by eminent authorities that the term "irrebuttable" or "conclusive" presumption is a misnomer—indeed a contradiction in terms. 9 *Wigmore on Evidence,* 3rd Ed., Sec. 2492, p. 292. In 4 *Wigmore on Evidence,* 3rd Ed., Sec. 1353, the author suggests that so-called irrebuttable or conclusive presumptions, since they are in actuality rules of substantive law, are to be tested as to validity by the extent of legislative power as to substantive rights under the State and Federal constitutions. It has been held that a rule making a trainer of race horses an insurer of the fact that the horse has not been given a drug before a race, is a valid rule which the authorities in charge of regulation of racing can make without affront to the constitutional rights of the trainer. *Sandstrom v. California Horse Racing Board,* 189 P. 2d 17,

*certiorari* denied, 335 U. S. 814, 93 L. Ed. 369; *State v. West Virginia Racing Commission,* 55 S. E. 2d 263. In each case the Court found the holding in *Mahoney v. Byers* not to be controlling, although for different reasons. Both Courts found that a state, in the exercise of its police power, may regulate race tracks and has plenary authority to do so if the regulation is reasonable. Reasonableness depends on the character or nature of the conditions to be met or over-come. The rule making the trainer the insurer of the horse's condition, although stringent, they held, is not unreasonable. This Court noted once again in *Southern Md. Agri. Assoc. v. Magruder,* 198 Md. 274, 279, as it had in the *Byers* case and previous cases, that the nature and problems of racing not only permit, but require, strict regulations by the State. It said that Maryland has established "a broad policy of pro-hibiting the commercial exploitation of the public's gambling in-stinct. * * * The Legislature has deviated from this policy by the exception in favor of betting at race tracks * * * The Maryland Racing Commission is given exceedingly wide and comprehensive regulatory powers. Examination of the 3rd Interim Report of the Kefauver Committee of the United States Senate demonstrates the wisdom of the Legislature in thus providing adequate controls where it determines that the anti-gambling laws are to be relaxed."

The highest Court of Florida, after finding an insurer type rule as to trainers to be valid, reversed itself on rehearing on the strength of the *Byers* decision in *State v. Baldwin,* 31 So. 2d 627, and found the rule arbitrary and unconstitutional.

The decisions of California and West Virginia find sup-port in many instances where responsibility or liability with-out fault has been held not to infringe constitutional rights. In *Ford v. State,* 85 Md. 465, the statute making mere posses-sion of lottery tickets a crime was upheld in the face of the argument that the act created artificial presumptions and made certain facts conclusive evidence of guilt which, in their nature, were not so. The Court rejected the argument that the accused could have possessed the slips without knowing that they were slips or without even knowing that he had them. The Court relied on *Carroll v. State,* 63 Md. 551,

where it was held that a licensed dealer in spirituous liquors cannot escape the penalty of selling to minors, even though the sale is made by a barkeeper in his absence, without his knowledge, and contrary to his explicit instruction understood by the barkeeper; and on *State v. Baltimore & Susquehanna Steam Co.,* 13 Md. 181, where the steamship company was held liable for violation of a law against transportation of slaves over the defense that the company and its agents had no knowledge that a slave was on board and, so, had no intent in violating the law. In the case last cited, the Court said: "Such Acts may produce mischief in individual cases" but that the general good justified and made valid the strictness of the law. The Supreme Court held in *United States v. Dotterweich,* 320 U. S. 277, 281, 88 L. Ed. 48, that legislation for regulatory purposes that dispenses with the condition of awareness of wrongdoing and places the burden of acting at his peril on a person otherwise innocent "but standing in responsible relation to a public danger" is a traditional means of regulation. Examples of approval of the Supreme Court of regulations of the kind referred to, include: *St. Louis & San Francisco R. Co. v. Mathews,* 165 U. S. 1, 41 L. Ed. 611—a statute making a railroad liable, regardless of negligence or fault, for all property injured or destroyed by fire from its locomotives; *Jones v. Brim,* 165 U. S. 180, 41 L. Ed. 677—a statute making liable, without regard to actual negligence or fault, any person driving a herd of horses or cattle over a public highway constructed on a hillside for damage done by the animals in destroying the banks or from rocks rolling onto the highway; *United States v. Balint,* 258 U. S. 250, 66 L. Ed. 604, where the language of *Shevlin-Carpenter Co. v. Minnesota,* 218 U. S. 57, 70, 54 L. Ed. 930, 936, that the state may prohibit certain acts in the maintenance of public policy, and provide that "he who shall do them shall do them at his peril, and will not be heard to plead in defense good faith or ignorance", was followed in upholding an indictment for violation of the narcotics law for selling drugs to one not having a written order in official form without charging that the defendant knew the drug to be such. In the *Shevlin-Carpenter* case, an act of Minnesota was up-

held as not denying due process of law by making subject to double damages and fine or imprisonment one who made a casual and involuntary trespass on state lands by cutting timber thereon without a valid and existing permit. It was said that the statute could be justified as a valid exercise of the police power, although the trespasser might have had reasonable grounds for belief that authority had been granted and honestly acted on such belief. There come to mind, also, workmen's compensation laws, making employers liable without fault and requiring payment to those declared to be dependent regardless of whether they are in fact. See, too, *Cloverland Farms Dairy v. Ellin*, 195 Md. 663, and cases collected in 4 *Wigmore on Evidence*, 3rd Ed., Sec. 1354, where, under the heading "Constitutionality of Statutes making Testimony Conclusive", sub-heading, "Statutes affecting Substantive Liability in Tort, Contract or Crime", it is said: "A statute which in reality deals with some rule of *substantive* law cannot be obnoxious to the present principle,—although it may be obnoxious to some constitutional proviso which protects the rule of substantive law in question. Thus, a statute which makes more stringent the rule of *responsibility for a tort,* by substituting some other test than negligence, may be constitutional."

We think a rule, such as Rule 111, that imposes the obligation on the trainer of a race horse to guard the horse against administration of drugs, is valid. The *Byers* case rejected the argument that failure to guard was carelessness within the meaning of the rule then before the Court because the Commission at that time imposed no specific requirement to guard. The *Byers* decision permits the inference that the Court felt such a requirement would not be unreasonable. Here there was evidence permitting the Commission to find that McGee failed to guard the horse adequately under the circumstances, and that, as a result, a drug could have been given the horse. For this reason, we see no necessity to decide whether the rule could be validly applied to a case where the trainer proved that he had taken every possible precaution and, nevertheless, a drug was detected in the system of the horse.

The record before us shows not only that the rule required the horse to be guarded properly, but that McGee himself felt a particular obligation in this respect, and recognized that weakness in the system of guarding could have allowed the administration of the drug. He was disturbed by the presence of the former employee, who had threatened to do him harm, on the other side of the barn in which his horses were stabled. He was made uneasy and put on guard by the disappearance of the halter. He acknowledged that the seventy-nine year old watchman, whose physical condition and faculties are not disclosed by the record but could be evaluated by the Commission, could not properly guard the horse, Morning After, even while he was on the premises, because of weather conditions and inadequate lighting at the barn. Moreover, his duties, on McGee's instructions, required him to be absent from Morning After's barn, feeding the horses in the other barns for a period of at least twenty minutes in the early morning. The barn left unguarded was the very barn in which the disgruntled employee was working. We think the record before the Commission permitted it reasonably to determine that the drug had been administered and was of a character to affect the racing condition of the horse.

The lower court, in its opinion, made much of the fact that the Commission in its finding said that "From a factual viewpoint, we regard the testimony presented for the defendant as inherently incredible in many aspects * * *", drawing the inference that the right of the accused to offer evidence in his own behalf under Rule 111, as distinguished from the rule in the Byers case, was worthless if the evidence was to be summarily dismissed as incredible. The lower court said, in speaking of Rule 111: "The rule, as amended, permits defendant to offer evidence in his behalf, but if such evidence is to be peremptorily dismissed as being 'incredible', with no reason given for such ruling, with no affirmative evidence showing neglect on the part of the trainer, and with no findings, supported by evidence, of any failure on the part of the trainer to maintain a proper guard, the amended rule in effect continues to make the trainer a guarantor against the presence of drugs." It would appear that the Commission, in

speaking of incredible testimony, was referring to the suggestions by McGee, the groom and the owner, that Morning After might have eaten straw on which something containing caffeine had been spilled or drunk water in which something containing caffeine had been spilled. The owner himself characterized this as a thousand to one shot and we think the Commission was not required to accept such odds nor to be found at fault for describing such a remote possibility as incredible.

If there was substantial evidence to justify the findings of fact of the Commission, it is not the function of the courts, in reviewing its action, to substitute their judgment for that of the administrative body. As we have said, we think there was evidence from which the Commission could have made the findings it did and, this being so, the lower court was in error in reversing its actions and in requiring it to reinstate the license.

*Order reversed, with costs.*