584 A.2d 709

**Marilyn GOLDMAN, et al.**

v.

**MARYLAND RACING COMMISSION.**

**No. 485, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Jan. 23, 1991.

William F. Renahan, Lanham, for appellants.

Bruce C. Spizler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and BISHOP and ROBERT M. BELL, JJ.

WILNER, Chief Judge.

Appellants Goldman and Capuano are trainers of thoroughbred horses and are licensed as such by the Maryland Racing Commission. In a consolidated proceeding, the Commission found that they had violated certain regulations proscribing the administration of drugs to horses entered in races and suspended their respective licenses for 15 days. The Circuit Court for Prince George's County upheld the Commission's action whereupon they have brought this appeal complaining that (1) the regulations are unconstitutional both facially and as applied to them and (2) the findings of the Commission are not supported by substantial evidence. We find no merit in either complaint and therefore shall affirm.

*The Regulations and Their Implementation*

The Maryland Racing Commission was created by the General Assembly and vested with "full power to prescribe rules, regulations and conditions under which all horse races shall be conducted within the State of Maryland." Art. 78B, § 11(a). Among the regulations promulgated by

the Commission pursuant to this authority are those codified as COMAR 09.10.01.11, captioned "Corrupt Practices." Paragraph B of that section deals with drugs and provides, in relevant part, that:

(1) "A horse participating in any race may not carry in its body any drug." Id. B(1).

(2) Phenylbutazone, sometimes called "bute," in an amount less than two micrograms per milliliter ($\mu$g/ml) of plasma is not regarded as a drug for purpose of the regulation, but any greater amount of that substance is regarded as a drug. Id. B(2).

(3) "A person may not administer, or cause to be administered, or participate, or attempt to participate in any way in the administration of any drug to a horse entered to race." Id. B(3).

(4) "The presence of a drug in the post-race saliva, urine, or other sample taken from the horse shall be prima facie evidence that the horse had been administered and carried the drug in its body during the race." Id. B(4).

(5) "Whenever the post-race sample taken from a horse discloses the presence of a drug, it shall be presumed that the drug was administered by the person or persons having control, care, or custody of the horse. The presence of any drug in a post-race sample is prohibited...." Id. B(5).

(6) "Every trainer has the duty to be familiar with these drug rules and to be familiar with the substances that are administered to his horse." Id. B(6).

(7) "The trainer shall be the absolute insurer of, and responsible for, the condition of each horse he enters in a race, regardless of the acts of third parties. A trainer may not start a horse or permit a horse in his custody to be started if he knows, or if by the exercise of reasonable care he might have known or have cause to believe, that the horse has received any drug that could result in a positive test. Every trainer shall guard or cause to be guarded each horse trained by him in such manner and for such period as to prevent any person from administering a drug to the

horse that could result in a positive test. If the post-race test reveals the presence of a drug, the trainer may be disciplined." Id. B(7).

(8) "The stewards may at any time order the post-race taking of a urine or blood specimen for testing from any horse who participated in a race." Id. B(9).

and

(9) "The Commission, in its discretion may fine, suspend, or revoke, or all of the above, the license of any person found to have violated these drug rules." Id. B(10).

In accordance with these regulations, the Commission requires that blood and urine samples be taken from each horse that finishes a race "in the money." Those samples—one container of urine and two vials of blood—are delivered to the Detention Barn, where the urine is separated into two containers. Each of the four containers is then tagged with a sample number, assigned by the Commission, that identifies the horse from which the sample was taken. One set—i.e., one container of blood and one container of urine—is sent to the Commission laboratory for testing. The other set is placed in a locked refrigerator in the Detention Barn and retained for three to four days.

The normal procedure of the Commission laboratory is to make an initial test only of the urine. If a chemical other than phenylbutazone is detected, that finding is reported to the Stewards without any testing of the blood. If phenylbutazone is found in the urine, however, the blood sample is tested to determine the quantity of the substance. The blood is tested on High Performance Liquid Chromatography equipment, which the Director of the laboratory described as "more or less state of the art for quantitation." If the test shows an amount of phenylbutazone in excess of what is allowed, it is repeated twice more to confirm the result, but only the lowest reading (if the results differ) is reported to the Stewards. Although under the Regulation (09.10.01.11 B(2)), any quantity of phenylbutazone greater than 2 $\mu$g/ml of plasma qualifies as a drug, in fact the

Laboratory did not, at the time relevant to this case, report quantities less than 2.5 μg/ml. We shall comment further on this later.

If the Commission laboratory reports the presence of a drug, including a prohibited amount of phenylbutazone, the trainer is given the opportunity to have the samples retained in the Detention Barn tested by an independent laboratory. That, indeed, is the sole purpose for which they are retained. If the Commission laboratory report is negative or the trainer opts not to have the retained samples tested, they are routinely discarded.

### This Case

On December 4, 1988, Libra Queen, a horse trained by appellant Capuano, won the fifth race at Laurel Race Course. The blood and urine samples taken after the race were assigned the number 0829. On December 6, Smarterilla, also trained by Capuano, finished second in the second race at Laurel. The samples taken from him were given the number 0204. The ninth race at Laurel on December 6 was won by Baca D'Or, trained by appellant Goldman. His samples were numbered 0133.

In accordance with the procedures noted above, one set of these samples was sent to the Commission laboratory and one set was retained in the Detention Barn. The laboratory tested the samples on December 8, 1988. The urine samples were subjected to an acid urine test and a thin-layer chromographic test, each of which verified the presence of phenylbutazone. The blood samples were then subjected to three separate high performance liquid chromographic tests to determine the quantity of the substance. The test results for Libra Queen (0829) ranged from 2.9829 to 3.3805 μg/ml of phenylbutazone. The results for Smarterilla (0204) ranged from 3.1829 to 3.4102; those for Baca D'Or ranged from 2.9589 to 3.4847. As the lowest reading for each horse exceeded 2.5 μg/ml, those results were reported to the Stewards. On being informed of the laboratory findings, appellants elected to have the retained samples

tested by an independent laboratory, in this case the New York State College of Veterinary Medicine. That laboratory reported findings of: (1) for 0829 (Libra Queen), 1.5 μg/ml; (2) for 0204 (Smarterilla), 2.2 μg/ml; and (3) for 0133 (Baca D'Or), 2.8 μg/ml.

Unfortunately, there were two particular problems with sample 0829. At the Commission laboratory, the blood sample first tested was temporarily mislabeled. Eventually, the mislabeling was discovered and the second two tests correctly revealed the origin of the sample. More significant, the blood and urine samples retained in the Detention Barn were discarded prior to December 8, and thus before the positive finding was reported by the Commission laboratory. Testimony before the Commission indicated that, normally, the retained samples are kept for three to four days after the race. The supervisor of the Barn then calls the laboratory to see if it is all right to discard the samples. If permission is given, the samples are thrown in the dumpster near the Barn.

Libra Queen, as noted, raced on December 4, but the laboratory did not get around to testing her blood until the evening of December 8. Inadvertently, however, the supervisor threw the retained samples in the dumpster before receiving word from the laboratory. He retrieved them from the dumpster the next day when he learned that the specimens sent to the Commission laboratory had tested positive. Although, by the time of the hearing before the Commission, the supervisor could not remember which sample number was involved, he recalled that he retrieved the one sample he was told to retrieve. The Commission's chief investigator testified that he examined the item recovered from the dumpster and noticed that it contained the number 0829.

Notwithstanding the mishandling of the retained specimen 0829, the Stewards, after a hearing, concluded that Libra Queen, as well as Smarterilla and Baca D'Or, had been administered drugs in violation of the Commission regulation and that appellants Capuano and Goldman were

responsible for that administration with respect to the horse(s) under their care. Sanctions appropriate to those findings were imposed, whereupon the trainers appealed to the Commission.

In light of the difficulties raised by the improper discarding of retained specimen 0829, the Commission, as its first order of business, dismissed the charge against Capuano with respect to Libra Queen. After a full evidentiary hearing, however, it concluded that Smarterilla and Baca D'Or had been drugged and that Capuano and Goldman were responsible. Accordingly, the Commission ordered that the two horses be disqualified, that the purses be redistributed, and that the trainers each be suspended for 15 days. As we observed, the Circuit Court for Prince George's County sustained the Commission's order; hence, this appeal.

## The Regulations

At oral argument, appellants acknowledged that they had, indeed, administered phenylbutazone to their respective horses and that there was evidence before the Commission of that fact. Notwithstanding that concession, they make three attacks on the regulations applied in this case. They contend first that COMAR 09.10.01.11 B(7)—the provision declaring the trainer to be the "absolute insurer" of the condition of the horse—is unconstitutional on its face in that it creates an irrebuttable presumption. They argue second that, because of what they regard as sloppy Commission record-keeping and procedures and the likelihood that the samples taken from Smarterilla and Baca D'Or were also mishandled, that regulation is unconstitutional as applied. Finally, they assert that the standard of 2 $\mu$g/ml, set forth in COMAR 90.10.01.11 B(2), has no rational relationship to any scientific or veterinary medical standard. None of these attacks has the slightest merit; indeed, in light of appellants' admission that they administered the drugs, their standing to mount the first two challenges is at least suspect.

■ The challenge to the facial validity of the "absolute insurer" regulation is based almost entirely on *Mahoney v. Byers,* 187 Md. 81, 48 A.2d 600 (1946). The regulation under attack there, a precursor of the one at issue here, began by prohibiting anyone from administering or knowingly or carelessly permitting to be administered to a horse any drug within 48 hours before a race. It then provided that if the Commission found a violation of that proscription, the trainer would be subject to penalty "whether or not he administered the drug, or knowingly or carelessly permitted it to be administered." The presence of the drug, it continued, "shall be conclusive evidence either that there was knowledge of the fact on the part of the trainer or that he was guilty of carelessness in permitting it to be administered."

The Court regarded the latter part of the regulation as creating a conclusive or irrebuttable presumption which destroyed the right of the trainer to offer evidence of his innocence. It noted that there was no requirement that trainers actually guard their horses during the 48–hour period, that the actual practice in that regard varied from trainer to trainer, and that the Commission did not, therefore, apparently regard the failure to guard the horse as carelessness. In that circumstance, the Court declared the regulation invalid as "condemning a trainer for failure to do something that the rules never required him to do, and under the guise of carelessness, punishing him for something he failed to do, when he had no way in the world to know that it was required of him by the Commission to do." 187 Md. at 88.

The issue of a trainer's obligation was back before the Court in *Maryland Racing Comm. v. McGee,* 212 Md. 69, 128 A.2d 419 (1957). As in *Mahoney v. Byers,* a trainer had been disciplined because his horse had been found drugged, but, based on *Byers,* the circuit court had ordered the Commission to restore the license. The regulation at issue, however, was different from that dealt with in *Byers.* It still prohibited anyone from administering or conniving at

the administration of drugs to a horse entered in a race, but, in place of the "conclusive evidence" language found deficient in *Byers,* it required a trainer to "guard, or cause to be guarded, each horse ... trained ... by him in such manner as to prevent any person or persons from administering to the horse, by any method, any drug prior to the time of the start of the race...."

The Court recalled the concern expressed in *Byers* about an irrebuttable presumption that effectively precluded a trainer from presenting exculpatory evidence but concluded that the issue was really not evidentiary in nature but rather one of substantive law, "to be tested as to validity by the extent of legislative power as to substantive rights under the State and Federal Constitutions." 212 Md. at 75, 128 A.2d 419. In that regard, the Court noted cases holding that "a rule making the trainer of race horses an insurer of the fact that the horse has not been given a drug before a race, is a valid rule which the authorities in charge of regulation of racing can make without affront to the constitutional rights of the trainer." *Id.,* citing *Sandstrom v. California Horse Racing Board,* 31 Cal.2d 401, 189 P.2d 17 (1948), *cert. denied,* 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948), and *State v. West Virginia Racing Commission,* 133 W.Va. 179, 55 S.E.2d 263. The decisions of those courts, the Maryland Court observed, "find support in many instances where responsibility or liability without fault has been held not to infringe constitutional rights," and thus it ultimately concluded that the Maryland regulation "that imposes the obligation on the trainer of a race horse to guard the horse against administration of drugs, is valid." *Id.* 212 Md. at 76, 78, 128 A.2d 419. *Byers* was distinguished on the ground that "the Commission at that time imposed no specific requirement to guard." *Id.* at 78, 128 A.2d 419.

The "absolute insurer" provision of COMAR 09.10.01.11 B(7) is not a free-standing one. Also included in that regulation—indeed immediately following the "absolute insurer" provision—are the twin duties of the trainer not to

allow a horse in his custody to be started if he has reason to believe that the horse has received a drug that could result in a positive test and to guard the horse "in such manner and for such period of time before racing the horse so as to prevent any person from administering a drug to the horse that could result in a positive test." The absolute insurer provision, therefore, does not really impose liability without fault; absent some extraordinary circumstance, of which there is no evidence in this case, the presence of a drug in a horse immediately following a race permits a fair inference either that the trainer administered the drug or allowed it to be administered or failed in his mandatory duty to guard the horse. That inference is especially appropriate in these cases, where, as we have indicated, the trainers have acknowledged administering the drug themselves.

*Byers,* we are convinced, does not govern this case and indeed is not really relevant to it. *McGee,* which reflects the nearly universal rule followed throughout the country, controls. Under that rule, COMAR 90.10.01.11 .B(7) is a valid regulation. *See,* in addition to *McGee* and the cases cited in it, *Berry v. Michigan State Racing Commissioner,* 116 Mich.App. 164, 321 N.W.2d 880 (1982); *Division of Pari–Mutuel Wagering, Etc. v. Caple,* 362 So.2d 1350 (Fla. 1978); *O'Daniel v. Ohio State Racing Commission,* 37 Ohio St.2d 87, 307 N.E.2d 529 (1974); *Jamison v. State Racing Commission,* 84 N.M. 679, 507 P.2d 426 (1973); *State ex rel. Spiker v. Racing Commission,* 135 W.Va. 512, 63 S.E.2d 831 (1951); *Arrington v. Louisiana State Racing Commission,* 482 So.2d 200 (La.App.1986); *DeGroot v. Arizona Racing Commission,* 141 Ariz. 331, 686 P.2d 1301 (App.1984); *Fioravanti v. State Racing Commission,* 6 Mass.App. 299, 375 N.E.2d 722 (1978); *Dare v. State, on Behalf of Dept. of Law, Etc.,* 159 N.J.Super. 533, 388 A.2d 984 (1978).

▇ The second challenge, as presented in appellants' brief, is that "[a]ppellants' evidence clearly indicated that the Commission laboratory mislabeling of the relevant samples more than likely led to sample 0829 being mistaken for

sample 0133 by Commission employees." As so presented, this argument appears to relate only to Goldman; no such contention is made with respect to sample 0204, taken from Capuano's horse Smarterilla. It may be that "appellants' evidence" could lead to that conclusion. What appellants overlook, of course, is that there was other competent evidence, credited by the Commission, to the contrary. The Commission found as a fact that the chain of custody of the blood and urine samples of both Smarterilla and Baca D'Or was properly maintained and that there was no indication that any tampering or alteration of those samples took place. We find no basis upon which to disturb those findings.

Appellants' third complaint about the regulations—that there is no rational basis for the 2 $\mu$g/ml standard—was not apparently presented to or decided by the Commission, and we therefore shall not consider it. Had the complaint been made before the Commission, it may be that the Commission's attorney could have presented evidence substantiating the scientific validity of the standard.

### Sufficiency of Evidence

As with the validity of the regulations, appellants present three complaints about the evidence. The first and third of these are essentially a repetition of appellants' assertion that the Commission mishandled at least sample 0133 and maybe sample 0204 as well and that the test results attributed to those samples were therefore unreliable. As we indicated, there was substantial evidence, credited by the Commission, that no such mishandling took place.

■ The second argument concerns a process known as hemolysis. The Commission laboratory, as we observed, ordinarily does not report findings of phenylbutazone less than 2.5 $\mu$g/ml, notwithstanding that the regulation precludes amounts greater than 2.0 $\mu$g/ml. The director of the laboratory explained that, at the time of the relevant events in these cases, there was neither a freezer nor a

centrifuge at the Detention Barn and that the retained specimens were simply kept in a refrigerator. In that circumstance, the blood specimen was subject to hemolysis, a process in which the red blood cells break open and begin to permeate the clear plasma. Phenylbutazone collects in the plasma, and thus the effect of the hemolysis is to dilute the concentration of that substance. It is therefore expected that any testing of the retained specimens, which will occur later than the testing of the specimens by the Commission laboratory, will produce findings of lower concentrations. By reporting only concentrations of 2.6 or more, the Commission in effect gave a cushion to the trainer in order to preclude charges that could not be fairly verified by the independent testing to which the trainer was entitled.

In fact, the independent results obtained in these cases *were* lower than those reported by the Commission laboratory, although, as we noted, even they exceeded the allowable concentration of 2.0 $\mu g/ml$.

Appellants' assertions to the contrary notwithstanding, the evidence fully explained the hemolysis process and its implications, and we find no error in the Commission's acceptance of that evidence.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.