744 A.2d 558

MARYLAND RACING COMMISSION

v.

Barbara J. BELOTTI.

No. 1616, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Dec. 1, 1999.

Reconsideration Denied Feb. 10, 2000.

24

**26**

Bruce C. Spizler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

Robert K. Thompkins (Patton Boggs, LLP, on the brief), Washington, DC, James H. Falk, Sr. (The Falk Law Firm, PLC, on the brief), Washington, DC, for appellee.

Argued before THIEME, MARVIN H. SMITH (Retired, Specially Assigned), and J. FREDERICK SHARER (Specially Assigned), JJ.

MARVIN H. SMITH, Judge (Retired, Specially Assigned).

The Maryland Racing Commission (the Commission) appeals the decision of the Circuit Court for Baltimore City that reversed the Commission's disqualification of a horse owned by Barbara Belotti, appellee, and resultant redistribution of purse monies. For our review, the Commission presents the following questions, which we have rephrased slightly:

I. Did the circuit court err in reversing the decision of the Maryland Racing Commission to disqualify a horse from its first place finish after the horse participated in the race while carrying an impermissible drug in its body?

II. Was it reversible error not to provide notice of a Stewards'[1] hearing to the owner of the horse?

---

1. The Stewards are "individuals appointed by the Commission to enforce the regulations of the Commission at a thoroughbred race track." COMAR 09.10.03.01B(3).

This case concerns the Commission's response to the presence of an impermissible drug, Lasix, found in a post-race urine sample taken from a horse who had won its race at Laurel Park. We reverse the circuit court because the decision to disqualify the horse lay squarely within the discretion of the Commission.

## The Maryland Racing Commission and its Control of the Administration of Drugs to Horses in Thoroughbred Racing

The Commission is provided for in title 11 of the Business Regulation Article of the Maryland Code. Subtitle 2 establishes the Commission, provides for its membership and staff, and sets forth its general powers. The powers of the Commission are not particularized; instead, section 11–210 authorizes the Commission to "adopt regulations and conditions to govern racing and betting on racing in the State[.]" In *Jacobson v. Maryland Racing Comm'n*, 261 Md. 180, 274 A.2d 102 (1971), the Court of Appeals discussed the broad powers delegated to the Commission:

> Horse racing is an endeavor and undertaking that necessarily must be the subject of intensive, extensive and minute regulation. It exists only because it is financed by the receipts from controlled legalized gambling which must be kept as far above suspicion as possible, not only to sustain and profit the racing fraternity but to feed substantial . . . millions to the State's revenues. Not surprisingly the legislature has given the Commission full power to control racing.

*Id.* at 183, 274 A.2d 102 (citation omitted). "The Legislature's purpose in granting to the Racing Commission the authority to promulgate rules was to assure that horse races in Maryland are 'conducted fairly, decently and clean[ly].'" *Heft v. Maryland Racing Comm'n*, 323 Md. 257, 263–64, 592 A.2d 1110 (1991) (quoting *Mahoney v. Byers*, 187 Md. 81, 84, 48 A.2d 600 (1946)).

"The statute combined with the Commission's rules and regulations provide a comprehensive scheme for the regulation

of horse racing in Maryland." *Silbert v. Ramsey,* 301 Md. 96, 105, 482 A.2d 147 (1984). The regulations of the Commission

> are more than merely helpful hints to those engaged in the horse racing industry. They are also precise rubrics, intended to ensure the integrity of the industry and to protect the public against fraud and corruption. They do this, in part, by establishing certain specific procedures to be followed in the running of races, by requiring nearly everyone participating in the conduct of racing to be licensed, and by placing specific responsibility on the various licensees to follow the mandated procedures.

*Sanders v. Rowan,* 61 Md.App. 40, 58, 484 A.2d 1023 (1984). *See also Maryland Racing Comm'n v. Castrenze,* 335 Md. 284, 294, 643 A.2d 412 (1994) ("[T]he Commission performs an active role of policy formation in order to ensure the integrity of horse racing in this State").

The extensive regulations promulgated by the Commission address the administration of drugs to horses racing in Maryland. In general, the administration of a drug[2] to a horse prior to a race is not permitted. COMAR 09.10.03.03A(19) &

---

2. COMAR 09.10.03.01B(1) defines what is a drug:
 (1) Drug. Except for phenylbutazone, quantitated at less than 2 micrograms per milliliter of the blood plasma of a horse, and Furosemide (Lasix), as prescribed in Regulation .08 of this chapter, "drug" means a substance:
 (a) Which does not exist naturally in the untreated horse at a normal physiological concentration;
 (b) Defined as a controlled dangerous substance under Article 27, §§ 277 and 300, Annotated Code of Maryland;
 (c) Intended to be used for the following reasons regarding diseases affecting a human or other animal:
 (i) Diagnosis,
 (ii) Cure,
 (iii) Mitigation,
 (iv) Treatment, or
 (v) Prevention;
 (d) Other than food, intended to affect the structure or a function of the body of a human or other animal; or
 (e) Intended for use as a component of an item specified in § B(1)(a)–(d) of this regulation.

.04A–B.[3] Indeed, COMAR 09.10.03.04B flatly states, "A horse participating in a race may not carry a drug in its body."

To enforce the drug prohibition, the Stewards may order the "[p]ost-race taking of urine, blood, or other samples for testing purposes from any horse which participated in a race[.]" COMAR 09.10.03.04E(1)(a).

The presence of a drug in the post-race urine, blood, or other sample taken from a horse is prima facie evidence that the:

(1) Horse was administered a drug and carried the drug in its body during the race; and

(2) Drug was administered by the person or persons having control, care, or custody of the horse.

COMAR 09.10.03.04C. In addition, the "trainer is the absolute insurer of, and responsible for, the condition of each horse the trainer enters in a race, regardless of the acts of third parties." COMAR 09.10.03.04D. This is so as "[t]rainers having charge, custody, or care of horses are obligated to protect properly the horses and guard against any violation of the Corrupt Practices Rules." COMAR 09.10.01.57Q. If a horse is found to have carried a drug in its body, the stewards may order the . . . "[d]enial, forfeiture, and prompt return of a

---

3. COMAR 09.10.03.03A, provides in relevant part:
 A. Except as provided in § A(14) of this regulation, the following acts are prohibited if committed on the grounds of a facility under the jurisdiction of the Commission, if they affect a race conducted live in this State, or if they affect the betting on a race in this State:
 * * *
 (19) Except as otherwise provided in this regulation, using or possessing, actually or constructively, any of the following items:
 (a) A drug, or
 (b) A hypodermic needle, hypodermic syringe, or other device which could be used for injection[.]
 COMAR 09.10.03.04A states:
 A. An individual may not administer, cause to be administered, participate, or attempt to participate in any way in the administration of a drug to a horse:
 (1) During the 24–hour period before the scheduled post time for the first race of the program in which the horse is to participate; and
 (2) Until after the race in which the horse is programmed to participate is run.

purse ... received by the owner...." COMAR 09.10.03.04E(1)(b). The stewards may also order "[r]edistribution of the items denied, forfeited, and returned, resulting from the disqualification of a horse found to have carried a drug in its body during a race, to those owners whose horses were advanced by the disqualification." COMAR 09.10.03.04E(1)(c).

One exception to the drug prohibition is provided for "bleeders"—horses that suffer from exercise induced pulmonary hemorrhaging (EIPH).[4] Lasix may be administered to a horse, i.e., a "bleeder," only if the horse has qualified for its use.[5] COMAR 09.10.03.08A. To qualify for the use of Lasix, any one of three conditions must be satisfied: (1) the horse has been observed to have bled from at least one nostril during or after a race or workout; (2) the horse has exhibited exercise induced pulmonary hemorrhaging resulting in a clear

---

4. "EIPH is defined as bleeding from the lungs with exercise. It is common among Thoroughbreds, Quarter Horses, Appaloosas, and Arabians. In fact, most racing Thoroughbreds will experience EIPH at some point in their careers." James M. Griffin, M.D. & Tom Gore, D.V.M., *Horse Owner's Veterinary Handbook* at 222 (2d ed.1998). *See also The Merck Veterinary Manual* at 1093 (Susan E. Aiello, D.V.M., ed. (8th ed. 1998) (EIPH occurs in virtually all racing Thoroughbreds, approximately 30% of Standardbreds, and has been found in Quarter Horses and Appaloosas after strenuous exercise. "EIPH has also been reported in horses used for jumping, barrel racing, roping, and polo, but does not occur often in horses used for endurance riding.")).

"Although EIPH has been recognized after trotting, it is associated more commonly with speeds > 14 m/sec or with short periods of strenuous exercise." *The Merck Veterinary Manual* at 1093. The exact mechanism by which the bleeding occurs has not been determined, but several causes have been proposed, including the increased pressure on the walls of the pulmonary capillaries that occurs during strenuous exercise, scarring from prior infections that could weaken the capillary bed, or "small-airway disease" caused by inhaled particulate matter and prior infections that prevent equal inflation of the lungs and cause a sheering stress "at the interface between slowly and normally expanding lung segments...." *Horse Owner's Veterinary Handbook* at 223; *The Merck Veterinary Manual* at 1093. EIPH may also be caused by some combination of these mechanisms. *Id.*

5. "The diuretic furosemide (Lasix), given before a race, is the most commonly used drug in the treatment and prevention of bleeding." *Horse Owner's Veterinary Handbook* at 223.

flow of blood in the lumen of the respiratory tract; and (3) the horse has qualified for the use of Lasix in another jurisdiction in accordance with criteria comparable to that required by the Commission. COMAR 09.10.03.08B.[6]

Only a veterinarian licensed by the Commission may administer Lasix to a horse qualified to receive the drug. COMAR 09.10.03.08G(1). In addition, "[t]he veterinarian who administers Lasix to a horse scheduled to race shall prepare a written certification indicating that Lasix was administered." COMAR 09.10.03.08G(3)(a). "The written certification shall be in the possession of a designated Commission representative at least 1 hour before the horse is scheduled to race." COMAR 09.10.03.08G(3)(b). "The stewards . . . shall order a horse scratched if the written certification is not received in a timely manner." COMAR 09.10.03.08G(3)(c). Any horse racing on Lasix shall be so denoted in the official program, which must

---

**6.** COMAR 09.10.03.08B & C cover the requirements necessary for a horse to qualify for the use of Lasix and provide:

 B. A horse qualifies for the use of Lasix if any one of the following conditions is satisfied:

 (1) The horse has been observed to have bled from at least one nostril during or after the running of a race or workout, either on the racing strip or in the barn area, within a reasonable length of time following the race or workout, by a veterinarian licensed by the Commission, and the observation has been reported to a Commission veterinarian not later than 10 days from that occurrence;

 (2) The horse has been found to exhibit exercise-induced pulmonary hemorrhage (EIPH) resulting in a clear flow of blood in the lumen of the respiratory tract on the basis of an endoscopic examination in accordance with the requirements of § C of this regulation; or

 (3) The horse has qualified for the use of Lasix in another jurisdiction, in accordance with criteria that the Commission determines substantially comply with, or are more stringent than, the requirements of this regulation as verified by a Commission veterinarian.

 C. Endoscopic Examination.

 (1) The endoscopic examination provided for in § B(2) of this regulation shall be performed by a practicing veterinarian:

 (a) Licensed by the Commission; and

 (b) Employed by the owner or trainer.

 (2) The results of the endoscopic examination performed in accordance with § C(1) of this regulation shall be delivered to a Commission veterinarian not later than 10 days after the horse was observed to have bled.

also include a specific indication that a horse is racing on Lasix for the first time. COMAR 09.10.03.08I(1). "When the official program contains past performance lines, those past performance lines shall indicate when a horse raced on Lasix." COMAR 09.10.03.08I(2). Finally, a post-race quantification limits the amount of Lasix a horse may carry in its body during a race. COMAR 09.10.03.08G(2).

## Factual Background

"La Beau," "Northern Nights," and "Mocefis" were three horses trained by James Lawrence, II. On July 30, 1997, Mr. Lawrence telephoned Laurel Park and entered the horses in three different races that were to be run on August 2, 1997. The entry blanks for "La Beau," who is owned by Barbara Belotti, and "Northern Nights" indicated that they were qualified to receive Lasix prior to running in their respective races. The third horse, "Mocefis," was not listed as being Lasix qualified. When Mr. Lawrence had called to enter the horses, however, he indicated that "La Beau" should not be given Lasix.

The night before the race in question, Dr. David Zipf, a state veterinarian, reviewed the list of horses scheduled to race the following day to determine their eligibility to receive Lasix. "La Beau" was designated to receive Lasix, but he was not Lasix qualified.[7] Dr. Zipf wrote "no" alongside the name "La Beau" and informed the Lasix clerk, George Russell, that the horse was not eligible to receive Lasix.

On the morning of August 2, 1997, Mr. Lawrence and an assistant, Howard Peyton, prepared the horses for their races. While at Mr. Lawrence's training center in Cecil County, the horses were fed a commercial feed that contained no additives. The horses were then loaded onto a van and driven by Mr. Peyton to Laurel Park. Peyton arrived at the Park between 9:00 and 9:30 a.m. and the horses were placed in their respective stalls at the receiving barn. Shortly thereafter, Dr.

---

7. COMAR 09.10.03.08E requires that a Commission veterinarian maintain up-to-date records of horses which qualify for the use of Lasix.

Morgan Dove, a veterinarian employed by Mr. Lawrence, met with Mr. Peyton and informed him of the respective times he would return to treat "La Beau" and "Northern Nights" with Lasix. Mr. Peyton questioned the administration of Lasix to "La Beau" and Dr. Dove showed him a slip made out by Racing Commission personnel indicating that "La Beau" was to be treated with Lasix.

Mr. Lawrence arrived at Laurel Park at approximately 11:00 a.m. and Mr. Peyton told him of Dr. Dove's information that "La Beau" was to receive Lasix. Mr. Lawrence went to the Lasix Office where he informed Mr. Russell that "La Beau" was not to receive Lasix. Russell told Lawrence that only Dr. Zipf was authorized to take a horse off the Lasix list. Mr. Lawrence then located Dr. Zipf, who stated that he had already told Mr. Russell that "La Beau" was not a Lasix horse. Lawrence returned to Russell, informed him of his conversation with Zipf, and Russell stated that he would take care of the matter. Lawrence and Peyton then prepared "Mocefis" for the third race and led the horse to the paddock. An unidentified groom, who spoke little English, was left with "La Beau" and "Northern Nights" to hold "Northern Nights" when Dr. Dove came to treat the horse with Lasix.

In the meantime, Dr. Dove was informed by Dr. Peacock, another state veterinarian, that "La Beau" was not to receive Lasix, so Dove squirted out the syringe of Lasix he had intended to give "La Beau." Dr. Dove was also called to the Lasix office, where he was again informed that "La Beau" was not to receive Lasix. At that time, Dr. Dove's assistant, Joshua Shofrogh, crumpled up the Lasix slip for "La Beau" and threw it in the trash.

Later, Dr. Dove and Mr. Shofrogh returned to the barn to treat "Northern Nights," who was running in the ninth race. Dr. Dove read the horse's lip tatoo [8] while Shofrogh matched it

---

8. Under COMAR 09.10.01.20B, a horse may not be allowed to race unless it has been tattooed on the lip by the Thoroughbred Racing Protective Bureau.

to the number written on the Lasix slip. Dr. Dove then treated "Northern Nights" with Lasix.

"La Beau" ran in the eighth race and finished first in a field of nine, earning $22,000 in purse monies. Following the race, a urine sample was collected from "La Beau." Five days later, the analysis was returned from the Commission laboratory. It revealed the presence of the drug furosemide (Lasix) and/or a derivative thereof. "Northern Nights" ran in the ninth race, but finished out of the money so no testing was done on that horse.

On August 8, 1997, the Stewards notified Mr. Lawrence by telephone of the positive test. Mr. Lawrence declined his right to have the split sample tested.[9] A Stewards' hearing was held on August 20, 1997. Following the hearing, the Stewards found that: (1) "La Beau" was not qualified for the use of Lasix under COMAR 09.10.03.08A; (2) the presence of Lasix in "La Beau's" post-race urine sample constituted a violation of COMAR 09.10.03.04B & C; and (3) Mr. Lawrence, as the trainer, was responsible for this violation under CO-MAR 09.10.03.04C(2) & .04D. In light of those findings, the Stewards ordered that: (1) Mr. Lawrence pay a fine of $500; (2) "La Beau" be disqualified from all purse monies; and (3) the purse from the eighth race be redistributed. Mrs. Belotti received no notice of the Stewards' hearing and was not in attendance.

Mr. Lawrence and Mrs. Belotti appealed the Stewards' decision to the Commission. In its written memorandum and order, the Commission made the following conclusions of law:

1. "La Beau" was not qualified for the use of Lasix as required under COMAR 09.10.03.08(A).

---

9. When a urine sample is obtained from a horse, a portion is sent to the Commission laboratory for testing and the remaining portion is retained in the detention barn until the stewards direct its disposal. COMAR 09.10.03.09F(1). Within 72 hours of being notified of a laboratory test demonstrating the presence of a drug, the owner or trainer of the horse may request that the split sample be forwarded to a laboratory for confirmatory testing. COMAR 09.10.03.09H(2).

2. "La Beau" participated in the eighth race at Laurel Park on August 2, 1997 while carrying a drug (Lasix) in its body in violation of COMAR 09.10.03.04(B).

3. Although it is unclear as to the method or means by which Lasix was in the body of "La Beau", James L. Lawrence II, as the trainer of the horse, is the absolute insurer of, and was responsible for, the condition of the horse, regardless of the acts of third parties. COMAR 09.10.03.04(D).

4. Considering that "La Beau" participated in the race while carrying a drug in its body, the horse should be disqualified from its first place finish and placed last.

5. Considering the extenuating circumstances attendant to this matter, the absence of bad faith, and the licensing history of trainer Lawrence, the imposition of a fine is not warranted.

The Commission then ordered that "La Beau" be disqualified and the purse monies distributed accordingly, but that no other sanction be imposed upon the trainer, Mr. Lawrence.

Mrs. Belotti appealed to the circuit court. It reversed the Commission's decision and ordered that the first place purse be distributed to her. The court's decision was based on two grounds. First, the court concluded that although the Commission claimed that the absolute insurer rule did not apply to Mrs. Belotti, that was precisely the rule applied by the Commission. The court concluded that the rule could only be applied to a "concededly innocent owner" through the doctrine of *respondeat superior*. The court explained that if the Commission's unstated reason was that the trainer is the absolute insurer of the horse and the horse was disqualified irrespective of the lack of culpability of the trainer and owner, then the absolute insurer rule would create an irrebuttable presumption, which, in light of *Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600 (1946), was unconstitutional. The court determined that "[t]he Racing Commission may not sanction a trainer or forfeit the purse of an owner without some evidence

in the record that they were in some degree culpable, no matter how slight that degree might be."

Second, the court determined that reversal was required as the hearing before the Stewards was conducted without notice to Mrs. Belotti and, thus, without her presence. The court wrote: "For the Stewards to forfeit an owner's purse without notifying the owner of the right to be present at a hearing, is clearly violative of due process."

## Standard of Review

■ In reviewing the decision of the Racing Commission, our role is the same as that of the circuit court. *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–304, 641 A.2d 899 (1994). As such, we do not directly review the decision of the lower court and, instead, review the administrative decision itself. *Public Serv. Comm'n of Md. v. Baltimore Gas & Elec. Co.,* 273 Md. 357, 362, 329 A.2d 691 (1974). *See also Consumer Protection Div. v. Consumer Publishing Co.,* 304 Md. 731, 749, 501 A.2d 48 (1985) ("Generally, in reviewing agency action . . . a court may only consider the record made before the administrative agency."); *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984) ("in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency.")

Under Maryland Code (1974, 1999 Repl.Vol.), § 10–222(h) of the State Government Article, a reviewing court may

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

■ The test for reviewing the factual findings of administrative agencies is that of "substantial evidence," which has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Supervisor v. Group Health Ass'n,* 308 Md. 151, 159, 517 A.2d 1076 (1986). "The scope of review 'is limited "to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached[.]"'" *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 512, 390 A.2d 1119 (1978) (quoting *Dickinson–Tidewater v. Supervisor,* 273 Md. 245, 256, 329 A.2d 18 (1974)). *See also Liberty Nursing Ctr. v. Department of Health and Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993) ("if reasoning minds could reasonably reach the conclusion reached by the agency from the facts in the record, then it is based upon substantial evidence, and the court has no power to reject that conclusion").

■ In applying the substantial evidence test, the reviewing court must not substitute its expertise for that of the agency. *State Admin. Bd. of Election Laws v. Billhimer,* 314 Md. 46, 58, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989). *See also Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080 (1979) (substantial evidence review "should not consist of judicial fact-finding or a substitution of judicial judgment for agency judgment"). Moreover, the court "must review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." *Baltimore Lutheran High School Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662–63, 490 A.2d 701 (1985).

■ In contrast to the agency's findings of fact, when "the issue before the agency for resolution is one solely of law, ordinarily no deference is appropriate and the reviewing court may substitute its judgment for that of the agency." *Liberty*

*Nursing Ctr.*, 330 Md. at 443, 624 A.2d 941. "[A] reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." *People's Counsel for Baltimore County v. Maryland Marine Mfg.*, 316 Md. 491, 497, 560 A.2d 32 (1989). "A challenge as to a regulatory interpretation is, of course, a legal issue." *Department of Human Resources v. Thompson*, 103 Md.App. 175, 191, 652 A.2d 1183 (1995). "In brief, so long as the agency's decision is not predicated solely on an error of law, we will not overturn it if a reasoning mind could reasonably have reached the conclusion reached by the agency." *Billhimer*, 314 Md. at 59, 548 A.2d 819.

## Discussion

### I.

The Commission alleges that this matter originally involved two parties, Mrs. Belotti and Mr. Lawrence, "La Beau's" owner and trainer, respectively, and that separate issues applied to each party. As to Mrs. Belotti, the question was whether "La Beau" raced with an impermissible drug in its body and the resultant redistribution of purse monies after the horse was disqualified. The question regarding Mr. Lawrence was what, if any, sanction should be imposed as he was responsible for the horse's participating in the race while carrying the impermissible drug. The Commission alleges that the absolute insurer rule does not apply to Mrs. Belotti, that it did not apply the rule to her, and that the circuit court erred in determining that the Commission had, in actuality, applied the rule through the doctrine of *respondeat superior*, thus creating an irrebuttable presumption violative of *Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600 (1946).

The Commission also alleges that the circuit court misstated the facts of the case in its decision, including: (1) that Lasix is not a performance enhancing drug; (2) that "La Beau" was qualified to receive Lasix subsequent to the incident in question; and (3) that the Commission was responsible for "a

virtual comedy of errors" that allegedly resulted in the erroneous administration of Lasix to "La Beau."

■ We agree with the Commission that it did not apply the absolute insurer rule to Mrs. Belotti and that it could disqualify "La Beau" and deny Mrs. Belotti the purse monies since the horse raced with an impermissible drug in its body, regardless of how the drug was administered to the horse.

We first note that although the actions regarding Mrs. Belotti and Mr. Lawrence were based on separate COMAR regulations, they both arose from the presence of Lasix in "La Beau's" body as discovered by the post-race urinalysis. From that point, the application of the regulations diverged with different consequences for the two parties. We stress, however, that Mr. Lawrence is not a party to this appeal and we do not discuss the Commission's decision as it affected Mr. Lawrence.

In *Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600 (1946), Benzedrine was found in the post-race saliva sample taken from a horse and the Commission suspended the trainer's license for one year. The applicable section of the Commission's rules provided:

(a) No person shall administer, or knowingly or carelessly permit to be administered to any horse entered for a race, any drug in any way within forty-eight (48) hours before the time of the race.

\* \* \* \* \* \*

(d) If the Commission finds from analysis of the saliva or urine, or blood taken from a horse on the day of a race in which the horse ran, or from other competent evidence, that any drug has been administered to the horse within forty-eight (48) hours before the race, the trainer shall be subject to the penalties prescribed in subsection (e) hereof, whether or not he administered the drug, or knowingly or carelessly permitted it to be administered. *The fact that the analysis shows the presence of a drug shall be conclusive evidence either that there was knowledge of the fact on the part of the trainer or that he was guilty of carelessness in permitting it to be administered.* [Emphasis added.]

The Court of Appeals held that the irrebuttable presumption established in the above quoted rule was unconstitutional. 187 Md. at 87, 48 A.2d 600. The Court commented:

From the fact that benzedrine was found in the saliva taken from the horse after the race, this irrebuttable presumption is substituted for facts necessary to find the appellee guilty under paragraph (d) of the rule. No facts or circumstances surrounding the stabling, care and attention given the horse after it arrived at Pimlico is to be considered. The appellee's reputation as a clean, straight, decent jockey and trainer, which he has borne among the racing world for years, and which was attested to by many witnesses of high standing, is not to be considered in determining his guilt or innocence. In fact, the Commission attested to appellee's fine record, as will appear from the remarks made by its chairman, contained in the record. All this, like so much chaff, is to be blown away as waste in the operation of the machinery set up under this paragraph. This irrebuttable presumption destroyed the right of appellee to offer evidence to establish his innocence. If this is "just," then the term "unjust" is without meaning.

The Commission is a creature of the Legislature and the Legislature does not possess the power under the State Constitution to prevent one from making a defense to a charge brought against him by substituting an irrebuttable presumption for facts. Such a law would be arbitrary, illegal, capricious and hence unconstitutional. "That the trial of facts, where they arise, is one of the greatest securities of the lives, liberties and estate of the People." Art. 20, Md. Declaration of Rights. This rule prevents the trial of facts and calls for the revocation of the license without cause shown.

187 Md. at 86–87, 48 A.2d 600.

Years later, the Court of Appeals was confronted with the validity of a similar rule in *Maryland Racing Comm'n v. McGee*, 212 Md. 69, 128 A.2d 419 (1957). There, a horse won the sixth race at Bowie, but a post-race urinalysis showed a

drug in the nature of caffeine, which could embrace amphetamine, benzedrine, cocaine, and morphine. *Id.* at 71, 128 A.2d 419. The rule in question stated:

No person shall administer, or cause or knowingly permit to be administered, or connive at the administration of, any drug to any horse entered for a race. Every owner, trainer, or groom must guard, or cause to be guarded, each horse owned, trained or attended by him in such manner as to prevent any person or persons from administering to the horse, by any method, any drug prior to the time of the start of the race which is of such character as to affect the racing condition of the horse.

Relying on this rule, the Commission suspended the trainer's license for six months. The Court of Appeals determined that the evidence presented to the Commission demonstrated that the trainer had engaged a night watchman to guard his many horses, including the horse in question. Nonetheless, the horses were housed in separate barns, the watchman had to travel between the barns to feed the horse, and the lighting conditions were inadequate in the barn where the horse in question was kept. In addition, the watchman was aged and was prevented from spending the night in the barn due to extreme weather. The trainer was also aware that a former employee, who the trainer had barred from the track and refused a day's pay, was working in the barn where the horse in question was stabled. *Id.* at 73, 128 A.2d 419. As a result, there was ample evidence before the Commission that the trainer had failed to adequately guard the horse in question. *Id.* at 73, 79, 128 A.2d 419.

The trainer argued that the rule "makes the trainer the insurer of the fact that the horse has not been given drugs before a race, because if drugs have been given, it follows that the trainer either gave them himself or was derelict in his duty under the Rule in preventing someone else from giving them, and that so construed, the Rule is unconstitutional and void under the holding of this Court in *Mahoney v. Byers*, 187 Md. 81 [48 A.2d 600]." 212 Md. at 74, 128 A.2d 419. The Court rejected that argument. It stated that *Byers* had held

"that an irrebuttable presumption was substituted for proof of the fact that the trainer administered the drug or was careless in allowing it to be administered and that the substitution of an irrebuttable presumption for the facts was arbitrary and unconstitutional." 212 Md. at 75, 128 A.2d 419. The Court commented that cases from other jurisdictions had held "that a rule making a trainer of race horses an insurer of the fact that the horse has not been given a drug before a race, is a valid rule which the authorities in charge of regulation of racing can make without affront to the constitutional rights of the trainer." *Id.* at 75, 128 A.2d 419 (citing *Sandstrom v. California Horse Racing Bd.*, 31 Cal.2d 401, 189 P.2d 17, *cert. denied*, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (1948), and *State v. West Virginia Racing Comm'n*, 133 W.Va. 179, 55 S.E.2d 263). The Court of Appeals noted that those decisions "find support in many instances where responsibility or liability without fault has been held not to infringe constitutional rights." 212 Md. at 76, 128 A.2d 419.

The Court concluded that the rule imposing a duty on the trainer to guard the horse against administration of drugs was valid. *Id.* at 78, 128 A.2d 419. The Court then distinguished *Byers:*

The *Byers* case rejected the argument that failure to guard was carelessness within the meaning of the rule then before the Court because the Commission at that time imposed no specific requirement to guard. The *Byers* decision permits the inference that the Court felt such a requirement would not be unreasonable. Here there was evidence permitting the Commission to find that McGee failed to guard the horse adequately under the circumstances, and that, as a result, a drug could have been given the horse. For this reason, we see no necessity to decide whether the rule could be validly applied to a case where the trainer proved that he had taken every possible precaution and, nevertheless, a drug was detected in the system of the horse.

*Id.* at 78, 128 A.2d 419.

The most recent case involving the absolute insurer rule is *Goldman v. Maryland Racing Comm'n*, 85 Md.App. 544, 584

A.2d 709 (1991). The incantation of the rule in effect at that time provided:

(4) The presence of a drug in the post-race saliva, urine, or other sample taken from the horse shall be prima facie evidence that the horse had been administered and carried the drug in its body during the race.

(5) Whenever the post-race sample taken from a horse discloses the presence of a drug, it shall be presumed that the drug was administered by the person or persons having control, care, or custody of the horse. The presence of any drug in a post-race sample is prohibited. . . .

(7) The trainer shall be the absolute insurer of, and responsible for, the condition of each horse he enters in a race, regardless of the acts of third parties. A trainer may not start a horse or permit a horse in his custody to be started if he knows, or if by the exercise of reasonable care he might have known or have cause to believe, that the horse has received any drug that could result in a positive test. Every trainer shall guard or cause to be guarded each horse trained by him in such manner and for such period as to prevent any person from administering a drug to the horse that could result in a positive test. If the post-race test reveals the presence of a drug, the trainer may be disciplined.

In that case, horses of two trainers finished in the money. Each tested positive for the drug phenylbutazone. At oral argument, the trainers admitted that they had administered the drug to their respective horses. Nonetheless, they attacked the validity of the provision declaring the trainer to be the "absolute insurer" of the condition of the horse. Relying primarily on *Mahoney v. Byers*, 187 Md. 81, 48 A.2d 600 (1946), the trainers argued that the provision was unconstitutional as it created an irrebuttable presumption. In upholding the absolute insurer rule, then Chief Judge Wilner noted for this Court that it was not a free-standing provision. 85 Md.App. at 552, 584 A.2d 709. Also included in the absolute insurer provision were the duties "not to allow a horse in his custody to be started if he has reason to believe that the horse

has received a drug that could result in a positive test and to guard the horse 'in such manner and for such period of time before racing the horse so as to prevent any person from administering a drug to the horse that could result in a positive test.' " *Id.* at 552–53, 584 A.2d 709. Accordingly, the absolute insurer rule "does not really impose liability without fault[.]" *Id.* at 553, 584 A.2d 709. Chief Judge Wilner continued: "[A]bsent some extraordinary circumstances, of which there is no evidence in this case, the presence of a drug in a horse immediately following a race permits a fair inference either that the trainer administered the drug or allowed it to be administered or failed in his mandatory duty to guard the horse." *Id. Byers* was not controlling; in fact, it was irrelevant. *Id. McGee* was the controlling precedent. *Id.* Accordingly, this Court concluded that the absolute insurer rule, which reflects the nearly universal rule throughout the country, was a valid regulation. *Id.*

Based on *McGee* and *Goldman*, although the precise wording of the absolute insurer rule has been altered slightly, any challenge to the rule, as applied to a trainer, must fail. However, Mrs. Belotti claims the rule was applied to her, an owner.

The "absolute insurer rule," COMAR 09.10.03.04D, *supra*, by its very terms applies only to the trainer and imposes responsibility for the condition of the horse only upon the trainer. We can discern no indication from the record before us that the Commission applied this rule to Mrs. Belotti. Indeed, no responsibility for the presence of Lasix in the horse was imposed upon Mrs. Belotti; that burden rested solely with Mr. Lawrence, albeit without a penalty as the Commission determined that the imposition of a fine was not warranted.

Under COMAR 09.10.03.04E(1)(b) & (c), the Stewards *may* order the forfeiture and redistribution of purse monies awarded to the owner of a horse found to have carried a drug in its body. That section, however, does not assign responsibility to any individual for the presence of the drug in the horse's body.

It merely responds to the fact that a drug was present. In the case before us, the presence of Lasix in the post-race urine sample taken from "La Beau" was *prima facie* evidence the horse carried the drug in its body during the race. COMAR 09.10.03.04C(1). The purse monies awarded to Mrs. Belotti were then forfeited and redistributed without any blame or responsibility being imposed upon her. Such action by the Commission was the consequence of "La Beau's" racing with Lasix in its body. Although this ruling had a great impact on Mrs. Belotti, in light of the broad powers delegated to the Commission to regulate, protect, and ensure the integrity of racing, it is a decision squarely within the expertise and discretion of the Commission.

 The patrons at Laurel Park on the date in question had no indication that "La Beau" was racing with Lasix in its body as the race program did not denote "La Beau" as a Lasix horse, nor did the owners, trainers, and jockeys of the other horses in the race. The Commission must also protect the public, the horses, the other owners, and the jockeys. The fact that "La Beau" raced with an impermissible drug in its body has implications beyond those affecting Mrs. Belotti. It is these interests, individuals, and the sport of Thoroughbred racing that the Commission must also consider in its decision. In such circumstances, a reviewing court should not substitute its judgment for that of the Commission. We decline to do so and the circuit court erred in so doing.

Mrs. Belotti's position is an example of the cases cited in *McGee*—"where responsibility or liability without fault has been held not to infringe constitutional rights." 212 Md. at 76–77, 128 A.2d 419. *See, e.g., Ford v. State,* 85 Md. 465, 480–81, 37 A. 172 (1897) (statute making possession of lottery tickets a crime, without knowledge as to nature of the tickets, upheld); *State v. Baltimore & Susquehanna Steam Co.,* 13 Md. 181 (1859) (steamship company held liable for illegal transportation of slaves over the defense that the company and its agents had no knowledge that a slave was on board). *See also McBriety v. Mayor and City Council of Baltimore,*

219 Md. 223, 240, 148 A.2d 408 (1959) (argument that ordinance imposing criminal liability for sale of liquor to under age minors without proof of knowledge or guilt of the person in actual charge, management, or control of the licensed premises was denial of due process was rejected). More recently, in *Rucker v. Comptroller of the Treasury*, 315 Md. 559, 555 A.2d 1060 (1989), the Court of Appeals determined that substantive due process was not violated by a statute imposing a tax liability on a corporate officer who had no responsibility for the payment of the taxes. *Id.* at 566–67, 555 A.2d 1060. The Court determined, in part, that the statute had a rational basis for holding officers liable for the payment of taxes—"the collection of taxes due and owing which might otherwise go unpaid." *Id.* at 567, 555 A.2d 1060. *See also Fox v. Comptroller of the Treasury*, 126 Md.App. 279, 290–93, 728 A.2d 776, *cert. denied*, 355 Md. 612, 735 A.2d 1106 (1999) (corporate officer liable for unpaid sales and use taxes even though he was not responsible for the collection and payment of those taxes under the corporation's by-laws). Although Lasix appears to have been administered to "La Beau" because of confusion and/or misidentification of the horse, and no responsibility rests with Mrs. Belotti, we are reminded that regulations like those at issue " 'may produce mischief in individual cases' but that the general good justified and made valid the strictness of the law." *McGee*, 212 Md. at 77, 128 A.2d 419 (quoting *Baltimore & Susquehanna Steam Co.*, 13 Md. at 187).

The circuit court was outraged over the circumstances under which Lasix was apparently administered to "La Beau." The court labeled the events "a virtual true comedy of errors" and believed it would be "a true comedy of errors" if it had not cost Mrs. Belotti $22,000 in purse monies. Even if we were to agree with this characterization, as discussed above, we cannot ignore the broad powers granted to the Commission to regulate and protect the integrity of the racing industry, along with its responsibility to the individuals who patronize the race tracks in this State. It serves as no basis for the circuit court to substitute its judgment for that of the Commission.

Finally, the circuit court determined that Lasix was not a performance enhancing drug, that the parties had conceded that Lasix was not a performance enhancing drug, that seven of the other eight horses in the race were running on Lasix, and that "La Beau" had qualified for the use of Lasix subsequent to the race in question.[10] In our review of the record, we cannot locate any concession on the part of the Commission that Lasix is not a performance enhancing drug. In its memorandum to the circuit court, the Commission conceded that "at the hearing before the Commission, there was no evidence to demonstrate that the presence of Lasix enhances the performance of a horse. . . . " This is merely a recognition of the absence of such evidence before the Commission and not a concession to an allegedly disputed fact. . In contrast, before this Court, the Commission argues that it never agreed that Lasix is not a performance enhancing drug and that "considering that Lasix is used to eliminate the phenomenon of 'exercise induced pulmonary hemorrhaging' . . . if a horse is enabled to race with clear lungs, it certainly will perform in a manner superior to the horse racing with blood-congested lungs."

 Near the close of the hearing before the Commission, Dale Lucas, the owner of the horse that placed fourth in the contested race, although not under oath, was asked if he had "anything to add to [the hearing.]" Mr. Lucas contended that "La Beau" was "outrunning what his real ability is without Lasix." Mr. Lucas further stated:

"As everybody knows, a horse on first time Lasix, it's noted in the programs and in the forms that they have first time Lasix because it enhances their performance. So, we were really running against something that we had no idea we

---

**10.** In its memorandum, the circuit court commented that the Commission conceded that on any given day, 75% of the horses racing were Lasix qualified. The court continued: "As already pointed out in the contested race, seven of the nine horses were qualified for Lasix. Lasix is concededly not a performance enhancer. It seems that the exception swallows the rule."

could be contending with without knowing this horse was on first time Lasix."

Mr. Lawrence countered that Lasix is not a performance enhancing drug. Ultimately, the Commission made no finding as to whether Lasix is a performance enhancing drug.[11] This absence of a finding is of no consequence because the regulations prohibit a horse from racing with "a drug" in its body. COMAR 09.10.03.04B. There is no requirement that the drug be performance enhancing.[12] Furthermore, that many horses

---

**11.** Although not addressed by the Commission, as an aside, we note that the effect of Lasix on EIPH is in some dispute.

The importance of EIPH is related to its possible etiology as a cause of poor racing performance.

In a typical example of "bleeders," the horse does well in the first three-fourths of the race but falls off markedly toward the end. The horse coughs and repeatedly swallows (blood), cools out slowly, and exhibits respiratory difficulty with rapid labored breathing. Bleeding through the nostrils is observed either immediately after the race or when the horse returns to its stall and lowers its head.

\* \* \*

[Studies indicate] that not all horses with EIPH experience poor racing performance, and that horses with EIPH who do fail to meet expectations may do so for reasons other than EIPH. However, in the small number of horses with *extensive* bleeding, it seems only logical that an airway full of blood would reduce maximum breathing capacity and oxygen exchange, and that this would be sufficient to account for the poor performance in these individuals.

\* \* \*

The diuretic furosemide (Lasix), given before a race, is the most commonly used drug in the treatment and prevention of bleeding. Surprisingly, although this has been studied, there is no evidence to show that giving Lasix has any influence on racing performance. This is understandable if, in fact, it is true that whether a horse bleeds or not has little if any effect on its performance. However, Lasix does appear to reduce the severity of bleeding in some individuals. *Horse Owner's Veterinary Handbook* at 222–23. Regarding the treatment of EIPH, *The Merck Veterinary Manual* at 1093 comments:

Treatment of horses with severe pulmonary hemorrhage is generally ineffective. Horses with mild hemorrhage may not require therapy.... The drug used most in control attempts is furosemide. Furosemide has not been shown to prevent EIPH, although it has been suggested that it may reduce the severity of hemorrhage because its use has been linked to a lowering of pulmonary blood pressure during exercise.

**12.** Mrs. Belotti does not challenge the authority of the Commission to enact the regulations on Lasix or their efficacy.

race on Lasix and that "La Beau" may have qualified for Lasix subsequent to this race is irrelevant to the fact that "La Beau" was not qualified for Lasix on the date in question. In determining that the exception swallows the rule, the circuit court, in effect, negated the rulemaking authority of the Commission. The circuit court lacks the expertise to determine that since a large number of horses race on Lasix, they no longer need to qualify for its use.

## II.

The Commission next contends that the notice of the Stewards' hearing provided to Mr. Lawrence, the trainer, was sufficient notice to Mrs. Belotti as Lawrence was her agent. In the alternative, the Commission contends that as the hearing before it was conducted *de novo*, any defect in the prior proceeding was cured by the full hearing before the Commission. Finally, the Commission alleges that any failure to notify Mrs. Belotti of the positive urinalysis was harmless as Belotti did not testify or present any evidence to the Commission regarding the presence of the impermissible drug in "La Beau."

Before we address these contentions, we must first decide if there is a decision by the Commission for us to review. During the hearing before the Commission, the Assistant Attorney General, who was representing the Commission, proffered evidence of the notice provided to Mrs. Belotti of the current hearing and Mrs. Belotti's counsel objected "because Mrs. Belotti never received notice of the initial Steward's hearing." The following exchange occurred:

[COUNSEL FOR THE COMMISSION]: Mr. Chairman, I would note that certainly the record shows and there's no dispute that Mr. Lawrence obviously was aware of the steward's hearing and participated in the steward's hearing and certainly he can be reasonably deemed to be acting as Ms. Belotti's agent as, as the licensed trainer for Ms. Belotti, and, and I think it's further reasonable for the, for the Commission to infer that Ms. Belotti knew or should have known through her trainer of this pending matter

before the stewards. Further, the issue—I'm not sure of the relevance of the issue to today's hearing. She is—there's no contention that this notice has not been properly provided to her for today's hearing so I think that the—and the notice—

MEMBER: Counsel is saying the defective part to the notice to this hearing because it references the fact of a steward's hearing and she was not notified. Is that what that says because—

[COUNSEL FOR THE COMMISSION]: Well, it references the steward's, it references the steward's hearing, that's correct, and the decision of the stewards on October 22nd, 1997[sic]. Now, [Counsel for Mrs. Belotti] has entered an appearance in this proceeding on behalf of both Mr. Lawrence and Ms. Belotti. So, she is—she's been notified, she's present through her counsel today to participate in this hearing. Now, I presume she'll I'll presume she'll have—

MEMBER: Assuming what you've been told is correct, it's not a perfect procedure but I don't think it's affected to the, to the point where—I mean, what would you want to do, go back and have a, have a steward's hearing?

[COUNSEL FOR MRS. BELOTTI]: Mr. Chairman, I—issue only on Mrs. Belotti's behalf in the event that further appeal became necessary. I wanted to make a record of the fact that she didn't receive notice.

[COUNSEL FOR THE COMMISSION]: Well, I'd note an objection since a record is being made on this matter that certainly Ms. Belotti has notice of today's proceeding. She had every opportunity to appear here, testify under oath as to any alleged problem with notice of the steward's hearing. So ... I question the appropriateness of, of making a record simply through proffers. If Ms. Belotti wished to testify she could have done so today regarding the steward's hearing or any other relevant issue.

CHAIRMAN: There's an objection to part of what that notice contains. We, we can admit that into evidence sub-

ject to [that] objection. The record will note that the objection was made.

[COUNSEL FOR THE COMMISSION]: Thank you.

UNIDENTIFIED SPEAKER: If I could also state along those lines, Mr. Chairman, that this is a de novo hearing before the Maryland Racing Commission. It's not a decision of this Commission as to whether it wishes to affirm or, or reverse a steward's decision, but it is in fact a de novo hearing before the Maryland Racing Commission—

CHAIRMAN: I understand.

UNIDENTIFIED SPEAKER:—and as a result the notice of today's hearing I think without question was provided to Mrs. Belotti.

CHAIRMAN: That's not even questioned, but there is some technical question as to whether Ms. Belotti was entitled to attend the steward's hearing. As I say, I don't think it's a fatal error.

There was no further discussion of this question and the Commission proceeded with the hearing. In its memorandum and order, the Commission did not address the lack of notice to Mrs. Belotti. It made no findings and reached no conclusions on that issue.[13]

It is clear that the Commission, as recognized by its Chairman, believed that there had been a defect in the procedure, but that the defect was not fatal. Indeed, how else could the Commission proceed with the hearing if it did not so conclude? Nonetheless, we are left to ask on what ground or grounds did the Commission proceed? Was it based upon the determination that Mr. Lawrence was Mrs. Belotti's agent and that notice to Lawrence was notice to Belotti? Or was it based upon the conclusion that the proceedings before the Commission were *de novo* and would thus cure any earlier defect? Or was it based on another reason?

---

**13.** In her appeal to the circuit court, although Mrs. Belotti mentioned the lack of notice in her memorandum, she did not contend that it was a ground for reversing the Commission's decision.

The importance of this question turns upon our standard of review, which is limited to the findings made by the Commission and its stated reasons. In *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 472 A.2d 62 (1984), Judge Rodowsky explained:

Judicial review of administrative action differs from appellate review of a trial court judgment. In the latter context the appellate court will search the record for evidence to support the judgment and will sustain the judgment for a reason plainly appearing on the record whether or not the reason was expressly relied upon by the trial court. However, in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency. "The courts may not accept appellate counsel's *post hoc* rationalizations for agency action. . . ." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

298 Md. at 679, 472 A.2d 62. "Without findings of fact on all material issues, and without a clear statement of the rationale behind the [agency's] action, a reviewing court cannot properly perform its function." *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 221, 630 A.2d 753 (1993). " 'We must know what a decision means before the duty becomes ours to say whether it is right or wrong.' " *United Steelworkers,* 298 Md. at 679, 472 A.2d 62 (quoting *United States v. Chicago, M., St. P. & P.R. Co.,* 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023 (1935)).

Although we are lacking an express statement, it is apparent that the Commission proceeded with the hearing based on the conclusion that it was a *de novo* proceeding.[14] We reach

---

14. We need not decide whether Mr. Lawrence was Mrs. Belotti's agent for purposes of receiving notice of the Stewards' hearing, but we note that when confronted with the question of whether a trainer's contributory negligence can be imputed to the owner, this Court has held that based upon the regulatory scheme, "in all that the trainer does in entering the horse and causing the horse to actually run in a race, he acts as the owner's designated agent." *Sanders v. Rowan,* 61 Md.App. 40, 59, 484 A.2d 1023 (1984).

this conclusion for two reasons. First, we look to the exchange between the unidentified speaker and the Chairman. There was an acceptance by the Chairman of the position taken by the speaker, *i.e.*, that it was a *de novo* hearing. Second, we look to the actual action taken by the Commission, which did, in fact, proceed with a *de novo* hearing. *See generally United Parcel Serv. v. People's Counsel for Baltimore County*, 336 Md. 569, 585–87, 650 A.2d 226 (1994) (in determining that Board of Appeals did not exercise original jurisdiction, Court considered, *inter alia*, that the Board did, in fact, treat case as an appeal). Although the regulations do not expressly provide that the hearing is *de novo*, it is apparent based upon the actual proceeding that this was the case.

> "A trial or hearing 'de novo' means trying the matter anew the same as if it had not been heard before and as if no decision had been previously rendered. Thus, it is said that where a statute provides that an appeal shall be heard de novo such a hearing is in no sense a review of the hearing previously held, but is a complete trial of the controversy, the same as if no previous hearing had ever been held...."

*Boehm v. Anne Arundel County*, 54 Md.App. 497, 509, 459 A.2d 590, *cert. denied*, 297 Md. 108 (1983) (quoting 2 Am. Jur.2d *Administrative Law* § 698 (1962) (emphasis omitted)). Stated another way, "a *de novo* hearing is an entirely new hearing at which time all aspects of the case should be heard anew as if no decision had been previously rendered." *Boehm*, 54 Md.App. at 511, 459 A.2d 590.

An appeal from a decision of the stewards may be made by an owner, trainer, or jockey. COMAR 09.10.04.04B(1). "The Commission, in its discretion, may ... [m]odify any sanction appealed." COMAR 09.10.04.04C(1). Extensive notice of the hearing before the Commission must be provided to the individual who is the subject of the hearing, including written notice of: (1) the time, date, place, and nature of the hearing; (2) the Commission's authority to hold the hearing; (3) the pertinent regulatory sections under which the Commission is acting; (4) a statement of facts; and (5) the potential penalty.

COMAR 09.10.04.06A(1)–(5). The notice must also include the advice that the individual has a right to be represented by counsel, call witnesses, submit evidence, request subpoenas for witnesses and documents, and request a copy of hearing procedures. COMAR 09.10.04.06A(6). The Commission must "provide for the making of an official record of the hearing, which shall include testimony and exhibits . . . ." COMAR 09.10.04.06D. If required for court review, the Commission must also provide a transcript of the hearing. *Id.* At the hearing, the individual "shall be given the opportunity to: (1) Be represented by counsel; (2) Be confronted with the evidence on which a charge is based; (3) Cross-examine witnesses; (4) Testify; and (5) Produce testimony and evidence relevant to the issues involved." COMAR 09.10.04.06E.

In the present case, all exhibits were presented to the Commission anew and Mr. Lawrence again testified as to the events of the day in question. Drs. Zipf and Dove were initially called as witnesses, but were excused as they concurred with Mr. Lawrence's statement. Although the Commission had the same exhibits before it as the Stewards did, there is no evidence that a recording was made of the Stewards's hearing or a transcript produced. The Stewards reached their conclusions based upon "the testimony they received and evidence presented at the hearing . . . ." Accordingly, the Commission could not review the basis of the Stewards' decision because they did not have a complete record of all the evidence presented to the Stewards. At the close of the hearing before the Commission, the Chairman commented:

> Mr. Lawrence, we can find no way in the world to change the decision of the steward with regard to redistribution of the purse. We all feel however that from a penalty standpoint, the $500 fine, that you were the victim of a mix-up and that you did everything you did to correct it and therefore we're going to waive the penalty of $500.

This is merely a recognition that the Stewards had reached the correct decision. In its memorandum and order, the Commission made its own findings of fact, conclusions of law,

and issued an order enforcing the decision. It did not refer to any findings by the Stewards, did not purport to affirm their decision to disqualify "La Beau," and did not act as if it was reversing the sanction imposed.

 We agree with Mrs. Belotti that due process requires that she be given notice and an opportunity to be heard. *See LaChance v. Erickson*, 522 U.S. 262, 266, 118 S.Ct. 753, 139 L.Ed.2d 695 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard.") "Both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights protect interests in life, liberty and property from deprivation or infringement by government without appropriate procedural safeguards." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 508–09, 709 A.2d 142 (1998) (footnote omitted). The Court of Appeals has stressed that "[t]he importance of giving adequate notice cannot be overstated." *Miserandino v. Resort Properties*, 345 Md. 43, 52, 691 A.2d 208, *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 292 (1997).

> "No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for generating the feeling, so important to a popular government, that justice has been done."

*Id.* (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951), Frankfurter, J. concurring (footnote omitted)). Nonetheless, "[d]ue process does not require adherence to any particular procedure. On the contrary, due process is flexible and calls only for such procedural protections as the particular situation demands." *Department of Transp. v. Armacost*, 299 Md. 392, 416, 474 A.2d 191 (1984). In the administrative setting, due process may require only a hearing at some stage of the process. *Quesenberry v. Washington Suburban Sanitary Comm'n*, 311 Md. 417, 425, 535 A.2d 481 (1988). "The demands of due process do not require a hearing, at the initial stage or at any particular point or at more than one point in

an administrative proceeding so long as the requisite hearing is held before the final order becomes effective." *Opp Cotton Mills v. Administrator of the Wage and Hour Div. of the Dept. of Labor,* 312 U.S. 126, 152–53, 61 S.Ct. 524, 85 L.Ed. 624 (1941).

In *Hill v. Baltimore County,* 86 Md.App. 642, 587 A.2d 1155, *cert. denied,* 323 Md. 185, 592 A.2d 178 (1991), this Court was called upon to decide a question similar to that presented here. In that case, Hill sustained an injury when he fell from a truck while employed as a maintenance worker with the Baltimore County Department of Recreation and Parks. He applied to the Board of Trustees of the Employees' Retirement System of Baltimore County and the Trustees referred the case to the County Medical Board. The Medical Board concluded that Hill was not totally disabled. Based on that information, the Trustees determined that Hill was not entitled to disability retirement benefits. Hill appealed to the Board of Appeals of Baltimore County, which, after notice and an opportunity to be heard, affirmed the Trustees' decision.

 Hill alleged that he was denied due process based on two grounds: (1) he was entitled to notice and a hearing before the Medical Board and Trustees because they made the ultimate determination; and (2) he had no input into the process at each stage. Relying on *Quesenberry, Opp Cotton Mills,* and *Boehm, supra,* this Court held "that an individual is provided due process of law even if he or she is not given notice of or a hearing at the initial administrative levels when he or she is afforded a de novo hearing at the County Board of Appeals." 86 Md.App. at 655, 587 A.2d 1155. Hill had notice of the hearing before the Board of Appeals, appeared with counsel, presented evidence, cross-examined witnesses, and had a complete record that formed the basis of the Board's decision. In addition, under its *de novo* review, the Board of Appeals could have decided the case completely, which cured any error existing in the earlier administrative decisions. *Id.* In light of *Hill,* any error committed by the lack of notice of the Stewards' hearing was cured by the *de novo* hearing held before the Commission.

■ Mrs. Belotti alleges that the hearing before the Commission could not be considered *de novo* since she did not have the opportunity to request the testing of the split sample.[15] She alleges that her ability to have the split sample tested was lost because she was not notified of the Stewards' hearing and the sample was disposed of before she knew of "La Beau's" positive test. This claim must fail as it was never presented to the Commission. *See Mayor of Rockville v. Woodmont Country Club*, 348 Md. 572, 582 n. 3, 705 A.2d 301 (1998) ("Judicial review of administrative decisions is limited to issues raised before the agency."); *Board of School Comm'rs of Baltimore City v. James*, 96 Md.App. 401, 426, 625 A.2d 361, *cert. denied*, 332 Md. 381, 382, 631 A.2d 451 (1993) (argument regarding lack of notice not presented to agency is not preserved for appellate review).

---

15. COMAR 09.10.03.09H–I governs split samples and provides:
 H. Split Samples.
 (1) The Commission, together with the applicable association representing a majority of the owners and trainers racing in Maryland, shall designate laboratories to which split samples of urine and blood may be sent for confirmatory testing.
 (2) Within 72 hours of being notified of a determination by the Commission laboratory that the testing of the blood or urine sample evidences the presence of a drug, the owner or trainer of the horse in question may request that the split sample of urine or blood, or both, be forwarded to one of the designated laboratories for confirmatory testing.
 (3) Upon a request for confirmatory testing, before the split sample is forwarded to the designated laboratory, the owner or trainer and a representative of the Commission shall execute an agreement that binds the owner or trainer and the Commission to the designated laboratory's findings. If the owner or trainer declines to execute the agreement, the split sample may not be forwarded to the designated laboratory for confirmatory testing.
 (4) After testing the split sample, if the designated laboratory:
 (a) Does not confirm substantially the Commission laboratory's findings, then any allegations that the drug in question was in the horse's system at the time of the race shall be dismissed; or
 (b) Confirms substantially the Commission laboratory's findings, then the finding shall be considered conclusive.
 (5) If, for whatever reason, confirmatory testing is not possible, § H(1)–(4) of this regulation is of no effect.
 I. The owner or trainer requesting the confirmatory testing shall bear the costs of the confirmatory testing.

At no time did Mrs. Belotti allege that she had been denied confirmatory testing of the split sample. Mrs. Belotti did contend that she was denied notice of the Stewards' hearing, but these are two separate arguments. The allegation that she lacked notice of the hearing did not encompass an allegation that she was denied the ability to request confirmatory testing. The notification regarding split samples contemplated by the regulations does not include any mention of a Stewards' hearing or any required notice for such a hearing. This seems to be the only logical approach as there would be no point in having a Stewards' hearing until the trainer's or owner's decision to request or waive the confirmatory test was obtained and then, if the confirmatory test was requested, to await the results of that test.[16] As Mrs. Belotti failed to allege that she was denied the ability to request confirmatory testing when it still might have been possible to conduct such a test,[17] she cannot be heard to complain of this for the first time on appeal.[18]

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF JUDGMENT AFFIRMING THE DECISION OF THE MARYLAND RACING COMMISSION. COSTS TO BE PAID BY APPELLEE.**

---

**16.** On August 8, 1997, Mr. Lawrence was notified by telephone that "La Beau's" urine sample tested positive for Lasix and that if he chose not to request confirmatory testing of the split sample the Stewards' hearing would be held on August 13. Mr. Lawrence did not waive his right to confirmatory testing until August 13 and the hearing was held on August 20.

**17.** The split sample is retained in the detention barn until the Stewards direct that it should be discarded. COMAR 09.10.03.09F(1). Mr. Lawrence waived testing of the split sample on August 13, the Stewards' hearing was held on August 20, and Mrs. Belotti noted an appeal to the Commission on August 22, but we have no evidence on whether the split sample was still available for testing.

**18.** We also note that Mrs. Belotti never alleged that there was any error in the sample taken from "La Beau," that the urinalysis was erroneous, that there was any problem with the chain of custody of the sample, or that the laboratory's procedures were faulty.